UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Governor Jesse Ventura,
a/k/a James G. Janos,                                Civil No. 12-0472 (RHK/AJB)

                    Plaintiff,

v.

Chris Kyle,

                    Defendant.

---

**PLAINTIFF GOVERNOR JESSE VENTURA'S MEMORANDUM
IN SUPPORT OF HIS MOTION TO AMEND TO CLAIM PUNITIVE DAMAGES**

---

### PRELIMINARY STATEMENT

Plaintiff Governor Jesse Ventura ("Governor Ventura") moves the Court pursuant to Fed. R. Civ. P. 15(a)(2) and Minn. Stat. §§ 549.191 and 549.20 for leave to amend his Complaint to claim punitive damages against Defendant Chris Kyle ("Kyle").  As shown below, there is clear and convincing evidence that Kyle knowingly fabricated and intentionally published a false and defamatory story about Governor Ventura, and appropriated his name and likeness for economic gain.  Because the false and defamatory story was published, and the appropriation occurred, under circumstances that were calculated, deliberate and intentional, Kyle has by definition acted with deliberate disregard for Governor Ventura's rights and this motion to amend to claim punitive damages should be granted.

## STATEMENT OF THE FACTS

**A.    KYLE ADMITTEDLY PUBLISHED HIS DEFAMATORY STORY ABOUT GOVERNOR VENTURA, REPRESENTING IT TO BE TRUE, AND THEN REPEATED IT ON TELEVISION AND RADIO.**

Kyle is the author of *American Sniper*, *the Autobiography of the Most Lethal Sniper in U.S. Military History*, published in January 2012 and sold nationally including in the State of Minnesota.[1]  He "told [his] story" to co-author Jim DeFelice, who then drafted the manuscript.[2]  Kyle publicly represents that the "events that happened in this book are true," and "the essence of what was said is accurate."[3]

In the *Scruff-Face* sub-chapter of his book, Kyle recounts an alleged incident in which Governor Ventura appears at a wake for a fallen SEAL, and proceeds to tell all present that he hates America, SEALs are murdering innocent people, and that SEAL's deserve to die; after which Kyle emerges as the hero when he sucker punches Governor Ventura and knocks him to the ground – giving him a black eye.[4]  The entire sub-chapter is set out, verbatim, in the Complaint.[5]  Kyle admits that "Scruff Face" is a pseudonym for Governor Ventura,[6] and he has publicly identified Governor Ventura as "Scruff Face" in radio and television interviews.[7]

The *Punching Out Scruff Face* sub-chapter reads, in its entirety, as follows:

---

[1]  Complaint ¶ 17; Answer, ¶17 (ECF Doc. No. 2); Borger Decl., Ex. A-2. (ECF Doc. No. 24-2).
[2]  Kyle Decl., ¶¶ 9 and 10. (ECF Doc. No. 27).
[3]  Kyle Decl., ¶ 11; Kyle Memo. at 3. (ECF Doc. No. 25).
[4]  *American Sniper*, pp. 310-12. (ECF Doc. No. 24-2).
[5]  Complaint, ¶ 18 and Ex. A; Answer, ¶ 18.
[6]  Kyle Memo. at 6. (ECF Doc. No. 25).
[7]  Kyle Memo, at 7; *See also* n.16-19, *infra*.

"AFTER THE FUNERAL WE WENT TO A LOCAL BAR FOR THE WAKE proper.

As always, there were a bunch of different things going on at our favorite nightspot, including a small party for some older SEAL's and UDT members who were celebrating the anniversary of their graduation. Among them was a celebrity I'll call Scruff Face.

Scruff served in the military; most people seem to believe he was a SEAL. As far as I know, he was in the service during the Vietnam conflict but not actually in the war.

I was sitting there with Ryan and told him that Scruff was holding court with some of his buddies.

'I'd really like to meet him,' Ryan said.

'Sure.'  I got up and went over to Scruff and introduced myself.

'Mr. Scruff Face, I have a young SEAL over here who's just come back from Iraq.  He's been injured but he'd really like to meet you.'

Well, Scruff kind of blew us off.  Still, Ryan really wanted to meet him, so I brought him over.  Scruff acted like he couldn't be bothered.

All right.

We went back over to our side of the bar and had a few more drinks.  In the meantime, Scruff started running his mouth about the war and everything and anything he could connect to it.  President Bush was an asshole.  We were only over there because Bush wanted to show up his father.  We were doing the wrong thing, killing men and women and children and murdering.

And so on.  Scruff said he hates America and that's why he moved to Baja California.  9/11 was a conspiracy.

And on and on some more.

The guys were getting upset.  Finally, I went over and tried to get him to cool it.

'We're all here in mourning,' I told him.  'Can you just cool it?  Keep it down.'

'You deserve to lose a few,' he told me.

Then he bowed up as if to belt me.

I was uncharacteristically level-headed at that moment.

'Look,' I told him, 'why don't we just step away from each other and go on our way?'

Scruff bowed up again.  This time he swung.

Being level-headed and calm can last only so long.  I laid him out.

Tables flew.  Stuff happened.  Scruff Face ended up on the floor.

I left.

Quickly.

I have no way of knowing for sure, but rumor has it he showed up at the BUD/S graduation with a black eye."[8]

————————

This passage from *American Sniper* contains matters of description, facts and circumstances sufficient for readers to infer that Kyle was referring to Governor Ventura, including: the "Scruff Face" reference to his famous facial hair; his status as an "older" "celebrity" former UDT / Seal who served during the Vietnam war;[9] his winter home in Baja California (Mexico); his opposition to the war in Iraq; the 9/11 "conspiracy" about

---

[8]  Complaint ¶ 18 and Ex. A; Answer, ¶ 18; Borger Decl. Ex. A-1 and A-2 (ECF Doc. Nos. 24-1 and 24-2).

[9]  Olsen Aff., **Ex. A**, Jones Tr. 78:25 – 79:11 (". . . he used the word 'famous' [in the book] so everybody -- most of the guys on our teams knew . . . who that was that they were talking about."); Olsen Aff., **Ex. B**, Lacz Tr. 54:10 - 15 (". . . when he was talking about a high profile SEAL there aren't too many of them .").

which he has talked and written; and his having been the speaker at BUD/S graduation ceremonies.[10]  Kyle admits both to providing the content for the *Scruff Face* sub-chapter, and to doing national television and radio interviews about it during which he repeats the story.[11]  The interviews were broadcast and made available on the Internet, including in Minnesota.[12]

————————

On January 4, 2012, Kyle appeared on the *Opie & Anthony* radio show:

HOST:  There's someone on the line saying that you had -- you were in a bar fight with Jesse, Ventura.  Is that true?

HOST:  What.

CHRIS KYLE:  God.

HOST:  It's probably -- is it?

CHRIS KYLE:  Yes.

HOST:  Oh, sh___ (expletive deleted).

HOST:  Oh, let's get into this.

* * *

CHRIS KYLE:  We, ah, we had just come back from our '06 deployment when we lost our guys.  We were having a wake for the guy who got the Medal of Honor, Mikey Mansoor.  And he happened to be there.  He was coming in for a graduating BUDs class that he was going to speak to.  And he was upset with the war.  He doesn't agree with it, which is fine.  I -- you don't have to agree with the war.  I just get sent there.  I don't have to agree

---

[10]  *See* Affidavit of David Bradley Olsen in Opposition to Defendant's Motion for Partial Summary Judgment ("Olsen SJ Aff."), Ex. 1, Kyle's Response to Requests for Admission, Nos. 2, 3, 4 and 5; Ex. 2, Ventura Response to Interrogatory No. 5.
[11]  Olsen SJ Aff., Ex. 1, Kyle's Response to Requests for Admission, Nos. 1 and 7-12.
[12]  *Id.*, Kyle's Response to Requests for Admission, No. 13.

with politics.  I signed up to serve the country; the country tells me what to do.

HOST:  Uh-huh.

CHRIS KYLE:  But he was making it known that he did not agree with it. And I approached him and said, "Hey, you know" --

HOST:  It's not the place.

CHRIS KYLE:  -- "I appreciate it, but we are having a wake."  It was the SEAL bar there in town.  I said, "We're having the wake here.  The family is here.  I would appreciate it if you'd just kind of keep it down."  He told us that we were killing innocent people over there --

HOST:  Oh, f___  (expletive deleted).

CHRIS KYLE:  -- men, women and children.  That we were murderers. And, you know, I said, "You know what, we can all have our differences, that's -- that's fine; but, please, just don't upset the family."

HOST:  Yeah.

CHRIS KYLE:  And then he said that, you know, we deserve to lose a few guys.

HOST:  Holy sh__ (expletive deleted).

HOST:  Jesse said that?

CHRIS KYLE:  Yes.

HOST:  What the f___ (expletive deleted) is wrong with him.

HOST:  So, by the way, all you guys out there that attacked me because I f___ ing (expletive deleted) attacked him, good, I'm glad to hear that.  He really is a douche.  And what happened when he said that to you?

CHRIS KYLE:  I punched him.

HOST:  Did you grab his ponytail?

CHRIS KYLE:  No, I punched him.

6

* * *

HOST:  Where did you punch him?

HOST:  Bravo.

CHRIS KYLE:  In the face.

HOST:  What happened?

HOST:  That's when you take a head shot.

CHRIS KYLE:  I mean, Jesse Ventura, he's --

HOST:  Big man.

CHRIS KYLE:  -- he's an older guy, too.

HOST:  Yeah, he's an older guy.

CHRIS KYLE:  Of course all the guys then started making fun of me.  "So what geriatric" (inaudible) -- (Laughter.)

HOST:  Wait.  When you hit him, did he hit you back, or...

CHRIS KYLE:  No, he -- he went down.

* * *

HOST:  Did his walker fall with him?

CHRIS KYLE:  Yeah, I think he fell out of his wheelchair.

HOST:  Wow.  Wow.  He went down.

HOST:  You hit a big dude.  He's a -- he's still Jesse the Body.  I mean, he's an older guy,  but he's still a big strong guy.

HOST:  Did he awkwardly get up and have to walk out of the place?

CHRIS KYLE:  I don't know.  I took off running, because the cops were already outside.  And as soon as I hit him, I knew, SEAL party, SEAL bar,

cops were watching, they saw the whole thing happen.   So I took off running.

HOST:  Oh, yeah.  So Jesse Ventura said to a SEAL at a bar where there was a wake for a SEAL:  "You deserve to lose a few guys"?

HOST:  Yeah.

CHRIS KYLE:  Yes, he did.[13]

_____

On January 5, 2012, Kyle appeared on the *O'Reilly Factor* on FOX TV:

MR. O'REILLY:  Personal story segment tonight:  Chief Chris Kyle, a Navy SEAL, is officially the most lethal sniper in U.S. military history. The Chief has written a brand new book called American Sniper, that chronicles his amazing story in Iraq.  I spoke with him last night.  So, Chief, I read your book.  Very entertaining.  I recommend it for my audience.  I think they'll like it.  First of all, you say you knocked Jesse Ventura to the floor with a punch.  Now, you don't mention his name, but everybody knows who that is.  Number one, that -- that happened?  You knocked him out?

MR. KYLE:  Well, I knocked him down.

MR. O'REILLY:  Knocked him down.  Why?  Why would you punch Ventura?

MR. KYLE:  It was in '06.  Was the year we lost our first two SEALS in Iraq.  We came home.  We lost our last guy just before coming home.  We had the wake in a SEAL bar there in Coronado.  And he was there.  He was there for a speaking engagement at a BUD ceremony, graduating class --

MR. O'REILLY:  Because he was a SEAL, right?

MR. KYLE:  Yes, sir.

---

[13]   Kyle admits that the above is an accurate transcript of what he said during the January 4, 2012, *Opie & Anthony* show interview.  *See*, Complaint ¶ 21 and Ex. B; Answer, ¶ 21; Olsen SJ Aff., Ex. 1, Kyle's Response to Request for Admission Nos. 7, 8 and 9.

MR. O'REILLY:  He was a Navy SEAL.  So he was badmouthing the war, right?

MR. KYLE:  Badmouthing the war, badmouthing Bush, badmouthing America.

MR. O'REILLY:  And you took exception?

MR. KYLE:  I did find a problem with it.  The family was there.  I asked him to please tone it down, that we did not want to upset the family members of Mikey Mansoor.

MR. O'REILLY:  Who was killed?

MR. KYLE:  Yes, sir.  And he earned the Medal of Honor.  He jumped on a grenade and saved everybody else around.

MR. O'REILLY:  But I want to be clear.  Ventura wasn't attacking him at all, verbally bashing him; he was just bashing the whole thing in general?

MR. KYLE:  Yes, sir.

MR. O'REILLY:  All right.

MR. KYLE:  Until he said we deserve to lose a few guys.

MR. O'REILLY:  He said we deserve to -- we, the United States --

MR. KYLE:  No.  He said, "You, y'all, deserve to lose a few guys."

MR. O'REILLY:  Navy SEALS.

MR. KYLE:  I -- I'm assuming.  He was saying that to me.

MR. O'REILLY:  Was he drunk?

MR. KYLE:  No, sir.  I never saw him with a drink in hand at all.

MR. O'REILLY:  So once he said, "You deserve to lose a few guys," you popped him?

MR. KYLE:  Yes, sir.

MR. O'REILLY:  Did he fight back?

MR. KYLE:  He went down.  The cops were there, I took off running.

MR. O'REILLY:  You ran?

MR. KYLE:  Yes, sir.

MR. O'REILLY:  Did they arrest you?

MR. KYLE:  No, sir.  I -- I have a master chief that always said, "Punch and run."[14]

_____

On January 10, 2012, Kyle again appeared on the *Opie & Anthony* radio show:

HOST:  What exactly happened, Chris?  If you could just refresh, because a lot of people might not have heard you on that moment.  Just if you could give us a brief -- just kind of sum the story up so people know what we're talking about.

MR. KYLE:  It was the wake for Mikey Mansoor, and of course all the families were there.  He was there.  He started getting loud and voicing his opinion coming out against the war and the troops and everything.  So we asked him to keep it down.  And he got belligerent about it, and finally said we deserve to lose a few.

* * *

HOST:  Now, Chris, is it possible that you and Jesse were arguing or you were debating and he said something to the effect of it's only natural you're going to lose a few?  Are you 100 percent sure that he said it and with the intention that you heard it?

MR. KYLE:  No.  I feel that (inaudible) he said exactly what I thought I heard.  Them other guys that were standing right there --

HOST:  Oh, they heard it as well?

_____

[14] Kyle admits the above is an accurate transcript of the January 5, 2012, *O'Reilly Factor on FOX TV* show. *See*, Complaint ¶ 22 and Ex. C; Answer, ¶ 22; Olsen SJ Aff., Ex. 1, Kyle's Response to Request for Admission No. 10.

MR. KYLE:  -- exact same way.

* * *

HOST: Chris, there's no doubt in your mind you punched Jesse Ventura that day, right?

MR. KYLE:  Yes, sir, definitely.[15]

————————

Kyle's interviews on *Opie & Anthony* and the *O'Reilly Factor* have been broadcast and made available on the Internet, including in Minnesota.[16]

## B.   KYLE'S STORY ABOUT GOVERNOR VENTURA IS A FABRICATION.

### 1.   The "Incident" Did Not Happen.

Governor Ventura has testified that Kyle's story about him is a complete fabrication because the incident described by Kyle did not happen.[17]

————————————

[15]  Kyle admits the above is accurate transcript of the January 10, 2012, *Opie & Anthony* show interview.  *See*, Complaint ¶ 24 and Ex. E; Answer, ¶ 24; Olsen SJ Aff., Ex. 1, Kyle's Response to Request for Admission No. 12,

[16]  Olsen SJ Aff., Ex. 1, Kyle's Response to Request for Admission No. 13.

[17]  Olsen SJ Aff., Ex. 2, Ventura Response to Interrogatory No. 2 ("The "incident" reported by Defendant that is the subject of this lawsuit did not happen"), and No. 7 ("The incident, as described by Kyle, is a fabrication").  In his sworn response to Interrogatory No. 7 Governor Ventura goes on to explain, in detail, that all of the statements attributed to him are fabricated, that the confrontation with Kyle never occurred, that there was no punch or any threats, and that the entire story is false. Governor Ventura has been deposed, and has testified consistently with his Interrogatory Responses.

**2.      23-Year Counter-Intelligence Veteran Bill DeWitt Has Testified the "Incident Did Not Happen."**

Bill DeWitt is a corporate security director in the private sector, and has served as a Navy SEAL, Army Ranger, Green Beret and, for 23 years, as an Army counter-intelligence officer.[18]  In October 2006 Mr. DeWitt went to McP's with Governor Ventura.[19]  They were together the entire time.[20]  The first Mr. DeWitt heard about Kyle was earlier this year, when Mike Seidler, a friend of his and Governor Ventura, and who was also at McP's the night in question, told Mr. DeWitt that Kyle was alleging an altercation took place between him and Governor Ventura.[21]  He is certain that the incident Kyle alleges to have occurred never actually happened and that he is making his story up.[22]

As always, several of the younger Team guys came over to Governor Ventura's table to meet him; but there was nothing out of the ordinary about any of the conversations, and there were no hostile words or gestures exchanged by anyone.[23]  Nor did Governor Ventura say anything to anyone at McP's to the effect that SEALs are murdering innocent people or SEALs deserve to die or to lose a few.  DeWitt knows Governor Ventura well enough to say, without any reservation, that he would never wish harm on any American serviceman, and would never say that SEALs, in particular,

---

[18]  DeWitt Aff., ¶¶ 2-3. (ECF Doc. No. 41).

[19]  DeWitt Aff., ¶ 5; Olsen SJ Aff., Ex. 2, Ventura Response to Interrogatory No. 2.

[20]  DeWitt Aff., ¶¶ 5, 10.

[21]  DeWitt Aff., ¶ 11.

[22]  DeWitt Aff., ¶¶ 9-10, 12-13; *Id.*; Olsen SJ Aff., Ex. 2, Ventura Response to Interrogatory No. 2; Olsen Aff., Ex. AA, Ventura Second Supplemental Response to Interrogatory No. 2.

[23]  DeWitt Aff., ¶¶ 9-13; Olsen SJ Aff., Ex. 2.

deserved to die.[24]   Just the opposite, Charlene DeWitt, who had never met Governor Ventura before, overheard him say, "I don't think the war is worth one SEAL dying for."[25]

Neither Chris Kyle nor anyone else punched Governor Ventura.[26] There was no altercation, and there was no incident.[27]   Kyle's story about Governor Ventura is a fabrication.[28]

### 3.   Kyle's Story is Not Credible.

Below are the multiple versions of the fabricated story Kyle has told.  Key points are underlined for emphasis.

#### (a)   *The Story Kyle Originally Told Co-Author DeFelice in 2011.*

In 2011 *American Sniper* co-author Jim DeFelice recorded an interview with Kyle.[29]   Kyle said that Governor Ventura "got loud about President Bush was an a--hole, we were doing the wrong thing, we're killing men and women and children and murdering and doing all this sh–t . . . and he told me that we deserve to lose a few."[30] "And then he bowed up, and then [I] knocked him down."   Kyle explained that the incident happened "out by the roadway" where there is "a little small parking area," and

---

24   DeWitt Aff., ¶¶ 10, 13; Olsen SJ Aff., Ex. 2, Ventura Response to Interrogatory No. 7.
25   Charlene DeWitt, Aff. ¶ 3. (ECF Doc. No. 40).
26   DeWitt Aff., ¶ 10; Charlene DeWitt Aff., ¶ 4.
27   *Id*.
28   DeWitt Aff., ¶ 13; Olsen SJ Aff., Ex. 2, Ventura Response to Interrogatory Nos. 2 and 7.
29   A transcript of the recorded interview (hereinafter "Kyle Interview Tr."), which was produced in audio format, is attached to the Olsen Aff. as Ex. J.
30   Kyle Interview Tr. 2-3.

that "we were on the sidewalk when I did it."[31]   Kyle said he "hit [Governor Ventura] in the eye," and that "he had at least one, I don't know if it was two black eyes or what the next day . . . he fell backwards and hit his head . . . he fell and hit the sidewalk . . . he didn't get back up."[32] Kyle then told DeFelice that he ran because "of course the cops were there."[33]   Kyle told DeFelice that he knew Governor Ventura had a black eye because he saw him on TV three or four days later, and because Governor Ventura showed up at the BUD/S Class 258 graduation the next day and "everybody was laughing" and asking "Who beat the shit out of him?"[34]

### (b)   *The Story Kevin Lacz Told Co-Author DeFelice in 2011.*

DeFelice also interviewed Kyle's SEAL teammate Kevin Lacz for the book.  Lacz told DeFelice that Pete Lauer had told him "Chris Kyle broke Jesse Ventura's leg."[35] But, then Lacz said, "No, this it how it happened,"[36] after which he explained that Governor Ventura was "talking shit, and then the next thing I know, like Kyle is out there choking - - he's choking Ventura out . . . And then that was it.  It got broken up.  But I was like, he choked up Ventura."[37]

At that point, DeFelice and Kyle should both have known that Lacz could not corroborate Kyle's story because: (1) Lacz's version was completely different from

---

[31]  *Id.*, 3-4.
[32]  *Id.*, 4-5.
[33]  *Id.*, 4.
[34]  *Id.*, 5.
[35]  A transcript of the recorded interview (hereinafter "Lacz Interview Tr."), which was produced in audio format, is attached to the Olsen Aff. as Ex. K. Lacz Interview Tr. 2.
[36]  *Id.*, 2.
[37]  *Id.*, 3.

Kyle's; and (2) Lacz candidly admitted to DeFelice in his interview that "<u>this was, what,</u> <u>five years ago and I was pretty sh–t-hammered [drunk]</u>."[38]   Nevertheless, DeFelice did not interview anyone else, and he and Kyle decided to include the story in the book.

> ### (c)   *The Story Kyle Told in Early Draft Versions of the American Sniper Manuscript.*

When DeFelice drafted the first version of the American Sniper manuscript,[39] he added a new detail so that it would not sound like Kyle assaulted Governor Ventura without provocation, saying instead that Governor <u>Ventura got "decked" only after he</u> <u>had "loaded up to punch [Kyle]</u>."[40]   Omitted was Kyle's claim that he saw Governor Ventura on TV a few days later with a black eye.[41]

In the next iteration of the manuscript additional details were added to make Kyle look more like a hero, and to make Governor Ventura look worse.[42]   DeFelice added that Governor Ventura said we were only in Iraq "because Bush wanted to show up his father" and "9/11 was a conspiracy."[43]   And, as the story morphed, Kyle this time remained "uncharacteristically level-headed" after Governor Ventura supposedly said "You deserve to lose a few," and Kyle suggested that "we just step away from each other and go on our way," and did not react physically until after <u>Governor Ventura "swung" at</u> <u>him first</u>.[44]   So, through sequential iterations, Kyle's story went from Governor Ventura

---

[38]  *Id.*, 3.
[39]  Olsen Aff., Ex. L.
[40]  *Id.*
[41]  *Id.*
[42]  Olsen Aff., Ex. M.
[43]  *Id.*
[44]  *Id.*

"bowing up," to "loading up a punch," to actually taking a "swing." And then, unlike the original version of the incident which supposedly happened out on the sidewalk, the alleged altercation moved inside the patio confines, where "<u>Tables flew.   Stuff happened</u>." <u>Jesse Ended up on the floor</u>."[45] Or, in other words, the story got better with each re-telling.

### (d)    *The Story Kyle Told After He was Warned of a Libel Lawsuit.*

Several manuscript iterations later Governor Ventura's name was removed from the story, with an editorial comment stating the reason to be, "<u>Don't want to use his full name or description.   Was warned of law suit</u>."[46] The title of the subchapter was correspondingly changed from "Punching out Jesse" to "Punching out Scruff Face."[47] But even with the redactions there was little mystery as to the subject of the story, as evidenced by an editor's comment on a subsequent draft which said, "Great story.  If it was witnessed by fellow SEALs -- thus corroberation (sic) against libel claim -- <u>can we mention who it was</u>? <u>Jessie (sic) Ventura, I take it</u>."[48]

### (e)    *The Story Kyle Told in the Published Version of American Sniper.*

Despite the fact that the descriptive elements of the "Scruff Face" subchapter make Governor Ventura readily identifiable, and despite the fact that Kyle had been warned of a libel suit, he included his fabricated story in the published version of *American Sniper*, including references to Governor Ventura taking a swing at Kyle,

---

[45] *Id.*
[46] Olsen Aff., Ex. N.
[47] Olsen Aff., Ex. O.
[48] Olsen Aff., Ex. P.

tables flying and stuff happening, and to Governor Ventura having a black eye when he showed up to the BUD/S graduation ceremony.[49] Omitted from the published version were various but not unimportant details from prior drafts, such as Governor Ventura supposedly hitting his head on the sidewalk and not getting up.[50] That detail, of course, would have made the lack of a police or ambulance report harder to explain, and would have made it virtually impossible to explain why none of Kyle's witnesses who were just feet away actually saw Governor Ventura laying on the ground for an extended period.

**(f)   *The Story Kyle Told in His Interrogatory Response*.**

In his response to Interrogatory No. 8, Kyle changed his story yet again.  This time, he  did not claim as written in the book that the alleged incident occurred on the patio of McP's where "Tables flew. Stuff Happened."   Instead, he  testified that it occurred "outside of McP's on the sidewalk, near some parking spots on the back side of the bar."[51] And he said, specifically, that he "punched Ventura with the closed fist of his right hand and that the punch landed on the left side of Ventura's face,"[52] and that he delivered the punch with force "sufficient to knock Ventura to the floor" and "sufficient to give Ventura a black eye."[53] In changing the location of the story from sidewalk, to patio, back to sidewalk, however, Kyle inadvertently left in his interrogatory response a reference to knocking Governor Ventura "to the floor," as opposed to the ground, the pavement or the sidewalk.

---

[49] *American Sniper*, pp. 310-12.
[50] Kyle Interview Tr., 4-5; Olsen Aff., Ex. L.
[51] Olsen Aff., Ex. Q, Kyle's Response to Interrogatory No. 8.
[52] *Id*.
[53] *Id*., Kyle Response to Interrogatory No. 11.

**4.      Kyle's Witnesses Cannot Corroborate His Fabricated Story.**

In response to this lawsuit Kyle's attorneys procured declarations from several of Kyle's SEAL teammates who were at McP's on October 12, 2006, along with two SEAL mothers who were also there, and a SEAL instructor who has heard stories about that night.   The SEAL teammates are Bob Gassoff, Andrew Paul, Jeremiah Dinnell, Kevin Lacz, John Jones, John Kelly and Guy Budinscak. [54]  The SEAL mothers are Debbie Lee and Debbie Job.  The SEAL instructor is Ivan Krusic.  All have now been deposed and their testimony, individually and collectively, fails to corroborate Kyle's story and shows it, instead, to be a fabrication.

**(a)      *Witness Testimony is Compromised by Alcohol.***

Kyle's SEAL buddies submitted declarations in his defense and, in support of their own credibility, said that a SEAL wake is a somber occasion, that they and Kyle did not drink much at McP's Irish Pub when the alleged incident with Governor Ventura occurred, and that they are able to remember the events from 2006 because they all tried to stay sober and under control.[55]   But in his book, Kyle writes as a preface to his story about meeting Governor Ventura at a SEAL wake that:

> SEAL funerals are kind of like Irish wakes, except there's a lot more drinking. Which begs this question, how much beer do you need for a SEAL wake?  That is classified information, but rest assured it is more than a metric ass-ton.[56]

---

[54]  Jones did not sign a declaration, but he was deposed.  Jones Tr. 74:1 - 17.

[55]  *See*, Decl. of: Budinscak, ¶¶ 16 and 17 (ECF Doc. No. 28); Dinnell, ¶ 20 (ECF Doc. No. 29); Gassoff, ¶ 12 (ECF Doc. No. 30); Kelly, ¶ 11 (ECF Doc. No. 32) ; Paul, ¶ 14 (ECF Doc. No. 35).

[56]  *American Sniper*, p. 308.

Kelly confirmed in his deposition that Kyle's written description "seems accurate."[57]

Lacz testified that he "might have been" drunk.[58] But in his original recorded interview, he told DeFelice that he was "sh– t-hammered" that night,[59] and confirms that there was "a copious amount of alcohol there."[60] Jones candidly admits in his deposition that he was "intoxicated that night . . . and it happened six years ago,"[61] and he was "trying to recall something -- in an intoxicated mind or frame, so -- I hope I'm not messing this up too bad."[62]   Kelly said, "[i]f there were no shots at that point, that wouldn't be a frogman wake,"[63] and "I can guarantee you somebody was puking that night."[64]

Mr. DeWitt, by his nature and training as a counter-intelligence officer, always watches and observes those around him, and he confirms Kyle's written description, as does his wife:  the younger SEALs at McP's were drinking heavily, including some who decided to climb a concrete structure nearby, and another who was puking in the bathroom.[65]   Kyle paid $1,000 to McP's for the tab.[66]

---

[57]   Olsen Aff., Ex. C, Kelly Tr. 164:8 – 12.
[58]   Lacz Tr. 33:21 - 22.
[59]   Lacz Interview Tr., 3.
[60]   Lacz Tr. 93:11-24.
[61]   Jones Tr. 72:9 – 73:17.
[62]   *Id.*, 69:18 - 23.
[63]   Kelly Tr., 135:16 – 136:20.
[64]   *Id.*, 163:9 - 18.
[65]   DeWitt Aff., ¶ 7.  *See also* Charlene DeWitt Aff., ¶ 5.
[66]   Olsen Aff., Ex. R.

**(b)**     ***Kyle's Witnesses Did Not Hear Governor Ventura Make the***
           ***Statements Attributed to Him.***

Gassoff did not see Kyle and Governor Ventura speak to each other or hear
anything they may have said to one another.[67] In fact, everything Gassoff knows about
what was said he heard from someone else.[68]

Paul never heard Governor Ventura say "Navy SEALs deserve to lose a few,"
"SEALs are killing innocent people," "SEALs are murderers," or that "SEALs are killing
women and children."[69]  In fact, other than a brief, ten-minute period, Paul did not hear
anything Governor Ventura said the entire evening.[70]  Nor could he hear anything
Governor Ventura and Kyle said to each other, and he did not really pay attention to
them, did not see any unusual body language and "didn't see anything that made it appear
to [him] that there was any kind of confrontation."[71]

Lacz did not hear Governor Ventura say the things attributed to him by Kyle.[72]
Just the opposite, Lacz testified that Governor Ventura was saying that he disagreed with
the manner in which SEAL missions were being conducted jointly with regular forces in
Iraq, and the gist of what he was saying is that, if SEALs continue to be put in those
situations, it is just a matter of time before they lose some guys.[73]  In other words,

---

[67]  Olsen Aff., Ex. D, Gassoff Tr. 124:25 – 125:l7; 127:1-15; and 127:23 – 128:6.
[68]  *Id.*, 123:9-18, 127:l-12.
[69]  Olsen Aff., Ex. E, Paul Tr. 106:22 – 107:8.
[70]  *Id.*, 108:13 – 109:11.
[71]  *Id.*, 110:19 – 111:7.
[72]  Lacz Tr. 41:7-8; 49:17-23; 101:2-22.
[73]  *Id.*, Tr. 37:7 – 39:17; 104:24 – 106:3.

according to Lacz, Governor Ventura was expressing concern for the safety of the SEALs fighting in Iraq -- not wishing death upon them.[74]

Jones did not directly hear anything from Governor Ventura's mouth that night at McP's, and does not recall any specific remarks anyone else present attributed to Governor Ventura.[75]   All Jones recalls is that Governor Ventura reportedly voiced objections to the tactic of SEALs operating during the day time, and in general to U.S. intervention in Iraq.[76] Jones did not hear anyone say that Governor Ventura had called SEALs murders, just that SEALs should expect to lose some guys if they continued using the types of tactics they were using in Iraq.[77]

Kelly didn't hear Governor Ventura make any of the alleged statements either: he only knows what Kyle told him Governor Ventura said.[78]   Kelly can't remember any specifics as to what Governor Ventura said about President Bush;[79] only that Governor Ventura was talking about the U.S. not fighting a military enemy in Iraq, but instead fighting "civilian population type."[80] Kelly never heard Governor Ventura say SEALs deserve to lose a few.[81] And he cannot remember anything else Governor Ventura said,[82] "[o]ther than that it was all hearsay, guys telling me what they heard him say . . . so I can't honestly say I heard him say the other things he had, but, I mean -- excuse me -- I

---

[74]  Lacz Tr. 107:12 – 108:23; 109:17 - 21.
[75]  Jones Tr. 89:8 - 23.
[76]  *Id.*, 90:13 – 91:8.
[77]  *Id.*, 49:7 - 20.
[78]  Kelly Tr. 78:12 – 79:11; 128:22 – 129:3.; 144:4 – 145:6.
[79]  *Id.*, 145:1-15.
[80]  *Id.*, 148:14 – 149:3.
[81]  *Id.*, 150:4 - 9.
[82]  *Id.*, 150:10 - 19.

trust my friends."[83] Kelly does not recall who told him that Governor Ventura had said

SEALs deserve to lose a few.[84]

Kelly is, however, able to explain what most likely happened, and how Kyle's

story started -- a bunch of drunk guys sitting in a bar, telling tales that kept getting better

as the night wore on.  As Kelly tells it, he met up with his Teammates at Danny's, a bar

down the street from McP's, where Kyle started telling the story of how he punched Jesse

Ventura.[85]   Before Kyle arrived, no one at Danny's was talking about Governor

Ventura.[86] But, after Kyle got there:

> . . . everyone's stories didn't start coming together until we all, you know,
> grouped up again, and through the close proximity of everyone at Danny's
> [a bar], I mean -- especially, you know, drinks started flying, everyone is
> real loud and started telling what they heard and they heard and this heard,
> and guys started getting all riled up . . . It just had a its own life and
> energy[.]"[87]

"And then . . . That's where the stories started, there at Danny's, and from there SEALs

like to talk, and pretty soon a lot of people in the SEAL community had heard this story

that Chris Kyle had told you at Danny's, is that [ ] right? . . . Yes."[88]

Kelly admits that, by the time he left Danny's that night, he had had between 15

and 20 drinks.[89]  He also admits that, "when I made it to Danny's . . that's when I got the

---

[83]  *Id.*, 154:8 - 16.
[84]  *Id.*, 157:21 – 158:10.
[85]  *Id.*, 178:4 – 179:10.
[86]  *Id.*, 182:14 – 183:7.
[87]  *Id.*, 158:11 – 159:2.
[88]  *Id.*, 184:12 -17.
[89]  *Id.*, 184:19 – 186:1.

whole story."[90] If I gave you specifics about what people were telling me "I would be doing the same thing they're -- they're doing, making -- making it up."[91]  "So one of the jokes in our community is we're a big sewing circle -- all we do is gossip."[92]

(c)   <strong><em>Kyle's Witnesses Did Not See Him Punch Governor Ventura.</em></strong>

Bob Gassoff did not see who was involved in any "commotion," see any tables being knocked over, or see Kyle or Governor Ventura leave after the alleged "commotion."[93] Everything Gassoff knows about the altercation that supposedly took place he heard from someone else.[94]

Paul said that even though he was only 15 feet away he did not see Kyle punch Governor Ventura, and did not see Governor Ventura on the ground.[95]  In fact, it "was more from the story [Kyle told] the next morning [that Paul could] kind of figure out what happened as it played out,"[96] because no one at McP's that evening talked about the alleged incident -- there was not any "kind of a buzz among the crowd" with "people saying, 'Wow, did you just see that? Jesse Ventura got hit?'"[97] Paul, in fact, did not even know Kyle had supposedly punched Governor Ventura until the next day when Kyle told him.[98]  But, although Paul is an officer and Kyle's superior, when Kyle told Paul that he

---

[90]  Jones Tr. 49:7 - 20.
[91]  *Id.*, 50:18 – 51:23.
[92]  Kelly Tr. 74:22 – 75:11.
[93]  Gassoff Tr. 124:25 – 125:l7; 127:1-15; and 127:23 – 128:6.
[94]  *Id.*, 123:9-18; 127:1-12.
[95]  Paul Tr. 115:5 – 116:9; 117:16-21; 118:13-16.
[96]  *Id.*, 123:19 –124:3; 130:23 – 131:20.
[97]  *Id.*, 126:12-19.
[98]  *Id.*

had punched Governor Ventura, Paul did not report him to either civilian or military authorities.[99]

Debbie Lee views Kyle and other SEALs as her adopted sons.[100]  She was at McP's on the night in question and left at about 10:30 p.m.[101]  But "other that what Chris Kyle has told [her she does not] have any other information about what actually happened" and she cannot identify any other people who have told her what happened.[102]

Before filing a declaration on Kyle's behalf, Debbie Job called him to discuss if she "was remembering it correctly or not, and she asked him specific questions to "help [her] remember correctly."[103]  She asked Kyle "if it happened on the front sidewalk, because that is where [she] know[s] that a police car had pulled up," but Kyle said it was "on the side street" so it "confirmed that [she] did not see it happen."[104]  Nor did she witness any interactions between Kyle and Governor Ventura,[105] or see any tables or chairs falling or tipping over.[106] She does, however, recall some sort of altercation that occurred down the street from McP's where "some guys were talking to some guy about something he said" -- and which did not involve Governor Ventura.[107]

---

[99]  *Id.*, 133:16 – 136:9.
[100]  Olsen Aff., Ex. F, Lee Tr. 127:16 - 25.
[101]  *Id.*, 120:3- 17.
[102]  *Id.*, 124:22 – 125:11.
[103]  Olsen Aff., Ex. G, Job Tr. 57:1 – 58:2; 59:4-16.
[104]  *Id.*, 57:15 – 58:5.
[105]  *Id.*, 83:8 - 11.
[106]  *Id.*, 84:3 - 7.
[107]  *Id.*, 84:8 – 85:4.

Lacz did not witness Kyle having angry words with or punching Governor Ventura.[108] Nor did he actually see Governor Ventura on the ground,[109] or see anyone around Governor Ventura or anyone help him up[110]-- even though Lacz describes Governor Ventura as "one of the top five most well known SEALs" of all time.[111] And, like the others, Lacz says that, even though Governor Ventura was famous, and was supposedly punched and knocked down at a gathering of SEALs, no one even discussed the alleged incident at the time.[112]

Jones did not see Kyle punch Governor Ventura, or even see them in close proximity to each other.[113] Nor did Jones see Chris Kyle around when the "incident" supposedly happened or actually see Governor Ventura on the ground.[114] Based on what he saw, Jones had no reason to believe that Governor Ventura did not just trip.[115] There was nothing he witnessed about the scene that led him to believe that there had been a physical altercation.[116]

Kelly did not see Kyle punch Governor Ventura,[117] did not see Governor Ventura fall,[118] and cannot recall ever speaking to anyone who actually saw Kyle punch Governor

---

[108] Lacz Tr. 109:25 – 112:24.
[109] *Id.*, 115:15 – 116:3.
[110] *Id.*, 51:15 - 16.
[111] *Id.*, 117:1 - 14.; 118:5-24.
[112] *Id.*, 119:4-9.
[113] Jones Tr. 57:19 - 24; 99:12 - 18.
[114] *Id.*, 61:8-11; 100:16 – 101:25.
[115] *Id.*, 105:21-25.
[116] *Id.*, 106:1 - 10.
[117] Kelly Tr. 174:3 - 8.
[118] *Id.*, 175:16-20.

Ventura,[119] or who saw him on the ground.[120]   Although Kelly believes he saw Governor

Ventura on the ground, he doesn't remember if he saw him get up, and doesn't remember

whether he hit his head on the ground or not.[121]

> **(d)**   ***Kyle's Witnesses Don't Know or Remember Which Story to Tell.***

> **(i)**   <u>**What Happened?**</u>

Kyle told co-author DeFelice in the original interview that when he allegedly

punched Governor Ventura he went down, <u>hit his head on the pavement</u>, <u>and did not get</u>

<u>up</u>. If that were true, one would expect that all of the people there would have seen

Governor Ventura laying on the ground for an extended period, there would have been

emergency response crews called to the site, and the incident would have made national

news.  But, as discussed in Section B(4)(c), above, none of Kyle's witnesses who claim

to have been present saw Governor Ventura either hit his head on the pavement or lay on

the ground as though he had.[122]

Paul testified that Governor Ventura was yelling and screaming at Kyle "F--- You.

I'm gonna f---ing kill you."[123] But Kyle has never mentioned anything about Governor

Ventura supposedly yelling obscenities in any of the versions of the story he has told, and

although all of Kyle's witnesses claim to have been within a few feet of the alleged

---

[119]  *Id.*, 125:17 - 25.
[120]  *Id.*, 126:1 -7.
[121]  *Id.*, 175:23 – 177:1.
[122]  Budinscak cannot corroborate Kyle's story either.  The transcript of his deposition was not available when this brief was due.
[123]  Paul Tr. 58:15 - 25.

incident, and to have earlier heard Governor Ventura engaging in conversation on the patio, not one of them claims to have heard him yell anything.[124]

Paul is also the only one who claims to have seen blood on Governor Ventura's lip.[125]   But no other witness claims to have seen any blood on Governor Ventura. [126]   Nor has Kyle said in his book or in any of his subsequent interviews about the book that his alleged punch caused Governor Ventura to bleed -- only that he thought he had given him a black eye.

Finally, Kyle said in his original interview with co-author DeFelice that the Coronado police were there and watched the whole thing.[127]   But, contrary to Kyle's story, there is no record of any police report of an assault on Governor Ventura in October 2006.[128]   Furthermore, Dinnell said there were no police there,[129] and neither Lacz[130] nor Jones saw any police.[131]   Paul [132] and Gassoff do not remember if the police witnessed the alleged incident or not.[133]   Kelly said only that he saw a cop car around the other side of McP's.[134]

---

[124]   Kelly Tr. 91:3 - 10; Lacz Tr. 51:17 - 18; Jones Tr. 108:11 -23.
[125]   Paul Tr. 124:22 – 125:22.
[126]   Kelly Tr. 196:7 - 12; Olsen Aff., Ex. H,  Dinnell Tr. 126:21-22; Jones Tr. 101:9 - 24.
[127]   Kyle Interview Tr., 4.
[128]   Olsen Aff., Ex. S.
[129]   Dinnell Tr. 129:8 - 14; 130:15-17; 132:18 – 133:4.
[130]   Lacz Tr. 127:9 - 15.
[131]   Jones Tr. 108:24 – 109:4.
[132]   Paul Tr. 58:27 - 60,:7; 126:20 – 127:4.
[133]   Gassoff Tr. 129:9 – 130:1.
[134]   Kelly Tr. 174:25 – 175:8.

### (ii)   <u>Where Did it Happen</u>?

As explained in Section B(3), above: (1) Kyle told his co-author that the alleged altercation took place outside McP's on the sidewalk; then (2) wrote in the published version of his book that it happened inside the patio walls at McP's where "Tables flew"; then (3) in answering an interrogatory Kyle went back to his sidewalk story.  It is not surprising, therefore, that Kyle's "witnesses" are also, both figuratively and literally, all over the map.

Gassoff consulted with Kyle to refresh his memory, and they exchanged a map of McP's' patio and agreed where they would say the alleged occurrence took place.[135] Nonetheless, Gassoff still could not say whether the supposed incident occurred inside the walls of the patio or outside the walls in the parking lot.[136]

Paul and Dinnell both place the "incident" inside the walls of the McP's patio. But Paul said Ventura and Kyle were on the northeast side of the patio when the alleged incident occurred, with Governor Ventura exiting through the opening on the south side; [137] and Dinnell says that it allegedly happened inside the patio walls, but on the opposite northwest end of the patio.[138] Lacz said that he saw Governor Ventura in proximity to Kyle near the parking lot area just outside of the northeast side of the McP's patio.[139]  But

---

[135]  Gassoff Tr. p. 80, 82:2 – 83:1 and Ex. 3.
[136]  *Id.*, 110:24 – 111:24 and Ex. 11, and 112:10 – 113:2 and Ex. 12.
[137]  Paul Tr. 110:10 - 18 and Ex. 15; 126:8-11.
[138]  Dinnell Tr,. 42:20 – 43:7 and Ex. 17; 51:11 – 53:11 and Ex. 17; 57:22 – 58:18 and Ex. 17.
[139]  Lacz Tr. 109:25 – 110:16 and Ex. 32.

Lacz did not see anything out of the ordinary about their interaction, and the next time he looked he saw Kyle alone and at the other end of the parking lot on the northwest side.[140]

Kelly says that Governor Ventura was outside the McP's patio wall on the northwest sidewalk -- not inside the patio and not in the parking lot on the northeast side.[141] Jones said he never saw Governor Ventura and Kyle in proximity to one another in the parking lot area, did not see Kyle in the area when the alleged incident occurred, and did not see any confrontation between the two.[142]  And Debbie Job recalls seeing a fight out on the sidewalk and down the street from McP's -- but that fight did not involve Governor Ventura.  No one  recalls any "tables flying" as Kyle wrote in his book.[143]

So, to sum it up, the alleged incident occurred: (1) inside the patio on the northeast side; or (2) inside the patio on the northwest side; or (3) in the parking lot to the northeast of the patio; or (4) on the sidewalk to the northwest of the patio; or (5) down the street and did not involve Governor Ventura.

### (iii)   *Jeremiah Dinnell's Incredible Testimony.*

Jeremiah Dinnell is the only one of Kyle's witnesses who claims to have actually seen Kyle punch Governor Ventura,[144] or who heard him say "SEALs deserve to lose a few." His memory, however, is highly selective, and his credibility is seriously suspect.

Dinnell does not remember how he got to McP's on the night in question, who

---

[140]  *Id.*, 111:18 – 112:24 and Ex. 32.
[141]  Kelly Tr. 80:23 – 83:9.
[142]  Jones Tr. 57:19 – 58:5.; 99,:5 – 100:15 and Ex. 37.
[143]  Kelly Tr. 177:5 - 25; Jones Tr. 103:1 - 18; Lacz Tr. 127:17 – 128:2;  Gassoff Tr. 127:13 -15;  Dinnell Tr. 120:15-18.
[144]  Dinnell Tr. Ex. 16.

drove or who was with him, [145] and he does not remember what he was drinking at the bar. [146]    Dinnell says that he left McP's for a period of time before the alleged incident occurred and went to a bar down the street called Danny's. [147] But he does not remember if he had any drinks there, or how long he stayed. [148] He does not remember if anyone was with him when he came back to McP's from Danny's. [149]  Although Dinnell said in his declaration that while at McP's Governor Ventura was telling stories about his wrestling days, Vietnam days and about being Governor of Minnesota, [150] in his deposition Dinnell said that he did not recall hearing Governor Ventura say anything about those topics. [151]    So, what does Dinnell remember?  He testified that, at the instant he arrived on the sidewalk outside of McP's patio, he: (i) noticed a group of people, including Kyle and Governor Ventura -- inside the patio walls at McP's near the northwest corner; (ii) heard Governor Ventura say "you deserve to lose a few"; and (iii) saw him get punched; but (iv) did not "actually see Governor Ventura hit the ground." [152] Aside from that one-instant snapshot, however, Dinnell remembers virtually nothing else of the entire weekend.

As explained in Section B(4)(d)(iii) above, Dinnell's testimony does not place him, or the alleged occurrence, anywhere even remotely close to where Kyle claims in his

---

[145]  Dinnell Tr. 99:12 – 100:10.
[146]  *Id.*, 101:16 – 101:23.
[147]  *Id.*, 110:18 – 111:17.
[148]  *Id.*, 111:18 – 112:6; 115:15 – 115:23.
[149]  *Id.*, 115:24 – 116:17.
[150]  *Id.*, Ex. 16.
[151]  *Id.*, 109:1 - 25.
[152]  *Id.*, 116:18 – 119:21; 121:19 – 126:25.

original story and Interrogatory response it happened.  Dinnell has Kyle and Governor Ventura inside the McP's patio, as opposed to out in the parking lot.  Not surprisingly, therefore, Dinnell does not remember hearing anything Kyle said,[153] or anything else Governor Ventura may have said, or any conversation between Kyle and Governor Ventura.[154]  He cannot recall how many people were in the crowd, or anything about the crowd at all, including the crowd's reactions or whether tables were knocked over or anything said by anyone, or even where Kyle and Governor Ventura were in relation to the crowd.[155]  Nor can Dinnell recall whether he returned to Danny's after he witnessed the incident and stayed until closing time, who he was with when he went back to Danny's, whether he had more drinks, whether anyone discussed the alleged incident that night, or what time he got home.[156]  And he cannot remember if anyone talked about the incident the next day, or even whether he went to work the next day or if it was a weekend, saying that "it's all kind of hazy because it was six years ago."[157]

Dinnell's testimony, and his credibility, can be summed up in two sentences:

Q.     So once you saw Chris Kyle strike Governor Ventura, is it your testimony that you really can't remember anything that happened after that?

A.     Yes, sir.[158]

And, if a picture is worth a thousand words, the alcohol-related pictures Dinnell has posted on his Facebook account for the entire world to see would exceed the page limits

---

[153] *Id.*, 119:1-4.
[154] *Id.*, 121:11 – 121:18.
[155] *Id.*, 119:10 – 121:10.
[156] *Id.*, 131:22 – 132:9.; 133:10 – 134:2
[157] *Id.*, 134:7-16.
[158] *Id.*, 127:11 – 129:7.

of this brief.  Those pictures show, graphically, why Dinnell's memory of the events in question is virtually non-existent, save for the few minutes of feigned clarity he perceives to be in his "brother" Kyle's interests.[159]

### 5.    Photographs Prove Kyle's Story to Be a Fabrication.

In 2006 Kyle was 6'2'', 220 pounds, could do 100 consecutive push-ups and 30 consecutive pull-ups, and he had been trained in hand-to-hand combat and mixed martial arts[160] to kill with his bare hands.[161] He says that he punched Governor Ventura in the face with a closed fist, and knocked him to the ground so hard that he fell backward, hit the back of his head on a sidewalk and did not get back up; and that he saw Governor Ventura on television three or four days later with a black eye, and heard that everyone at the BUD/S graduation the following day was making fun of Governor Ventura because he looked like he "got the sh–t beat out of him."  Documents obtained during discovery, including  photographs taken on October 12, 13 and 14, 2006, tell a different story.

The documents establish the following sequence of events:

- ▪ Governor Ventura arrived in San Diego, California on the evening of Thursday, October 12, 2006, and at 7:29 p.m. rented a car at the San Diego airport.[162]

- ▪ Governor Ventura and his BUD/S Class 58 classmates were scheduled to attend an "informal gathering" at McP's Irish Pub on the evening of Thursday, October 12, 2006.[163]

---

[159]  Dinnell Tr., 90:22-24 and Exs. 18-25.
[160]  Olsen Aff., Ex. Q, Kyle Response to Interrogatory Nos. 10 and 12.
[161]  Olsen SJ Aff., Ex. 1, Kyle Response to Request for Admission No. 25.
[162]  Olsen Aff., Ex. T.
[163]  Affidavit of Governor Jesse Ventura ("Ventura Aff."), Ex. A.

- BUD/S Class 258 was scheduled to graduate the following day, Friday, October 13, 2006, at 3:00 p.m.[164]

- Governor Ventura and several of his BUD/S Class 58 classmates attended the graduation.[165]

- The next day, Saturday, October 14, 2006, they attended a picnic.[166]

- Governor Ventura was scheduled to return his rental car to the San Diego airport on Sunday, October 15, 2006, at 11:00 a.m.[167]

Photographs show a smiling Governor Ventura at McP's on the evening of Thursday, October 12, 2006, with his arm around SEALs of Kyle's approximate age.[168] Other photographs depict Governor Ventura on Friday, October 13, 2006, at the BUD/S Class 258 Graduation,[169] and at the Saturday, October 14, 2006, BUD/S Class 58 picnic.[170] None, however, show Governor Ventura with a black eye or eyes, a bruised or bloodied lip, or otherwise exhibiting any physical effects of a supposed blunt force trauma to his face or head delivered by a trained killer. That is because Kyle's story is a complete lie. Kyle knows it, and the photographs confirm it.

## C.   GOVERNOR VENTURA'S REPUTATION HAS BEEN DAMAGED BY THE DEFAMATORY STORY.

Over the years, Governor Ventura has maintained close friendships with his former BUD/S classmates and has occasionally spoken at SEAL graduation ceremonies,

---

[164] Olsen Aff., Ex. U.
[165] Ventura Aff., Ex. C.
[166] *Id.*, Ex. D.
[167] Olsen Aff., Ex. T.
[168] Ventura Aff., Ex. B.
[169] Ventura Aff., Ex. C.
[170] Ventura Aff., Ex. D.

where he has always been treated with respect.[171] While he has criticized government policy and publicly opposed the war in Iraq, he has always supported America's troops would never wish harm upon them.[172] Governor Ventura is so proud of his UDT/SEAL service that, prior to Kyle's defamatory statement, and post-Iraq war, he had the SEAL Trident tattooed on his body.[173]  The Trident is also painted on his motorcycle, and he proudly wore the Trident in his official portrait at the Minnesota State Capitol.[174]  By falsely claiming that Governor Ventura said SEALS deserve to die, Kyle intended to inflict a vicious and deliberate assault on his character and reputation, and to turn the SEAL community and all Americans against him.[175]

Kyle concedes that, for a Navy SEAL, the Trident medal is a "symbol of who were are[.]"[176] In his book, he talks about the "SEAL mentality and lifestyle and camaraderie."[177] He also acknowledges that making a "dispute between two of its members public" could "harm the SEAL community[.]"[178]

Kyle's SEAL friends admit that the "story of Chris [Kyle] punching Ventura definitely took off within the SEAL community on the West Coast,"[179] that the "fight between Chris [Kyle] and [Governor] Ventura was well-known all over the West Coast

---

[171]  Olsen SJ Aff., Ex. 2, Ventura Response to Interrogatory No. 7.
[172]  *Id*.
[173]  *Id*.
[174]  *Id*.
[175]  *Id*.
[176]  Kyle Memo. at 2.
[177]  Kyle Decl., ¶ 12.
[178]  *Id*., ¶ 16.
[179]  Budinscak Decl., ¶ 21.

SEAL teams,"[180] "word of Chris [Kyle] punching out [Governor] Ventura spread pretty quickly,"[181] and that "the story . . . spread throughout . . . the SEAL community pretty fast."[182]

Before Kyle's book came out, however, the story that was making the rounds in the SEAL community had only to do with vague references to Governor Ventura being punched; there were "no details of the story. It's . . . just that Chris knocked down Mr. Ventura."[183]   Jones said that, "I think most of the community even forgot about it until the book came out."[184]   Many different versions of the story have been told over the years, all of them having the general theme that "Jesse got knocked out on the deck of McP's," "Jesse got knocked out in front of McP's," or "Jesse got knocked out somewhere."[185]   But, when the story has been told prior to Kyle's book, "it was just somebody knocked him out," and what Governor Ventura supposedly said to provoke the punch was never part of the story, other than generalities about "running his mouth."[186]

After Kyle's book came out it was different.[187] There are thousands of public comments posted on Internet and news sites that vilify, malign, disparage and, in general,

---

[180]   Dinnell Decl., ¶ 21.
[181]   Gassoff Decl., ¶ 14.
[182]   Kelly Decl., ¶ 17.
[183]   Dinnell Tr. 134:17 – 135:20.
[184]   Jones Tr. 78:25 – 79:11.
[185]   Olsen Aff., Ex. I, Krusic Tr. 32:18 – 35:23; 61:22 – 63:25.
[186]   *Id.*, 62:22 - 64:19.
[187]   Complaint ¶ 23 and Exhibit D; Answer ¶ 23.

exhibit disgust, hatred and contempt for Governor Ventura because of the statement Kyle attributes to him about SEALs being murderers and deserving to die.[188]

Kyle's own witnesses also uniformly agree that attributing to Governor Ventura statements to the effect that he believes SEALs are murderers and SEALs deserve to die lowers his reputation and standing in the SEAL community.[189]  "It's absolutely appalling to make those kinds of statements at a wake," and "it would be considered one brother turning against another if a SEAL actually did say that SEALs deserve to die for what they're doing overseas."[190]   "A former SEAL or former UDT guy who would say something like that would certainly be shunned by his former brothers . . . that's just bad -- bad stuff all around."[191] The only thing more vile than the statements Kyle attributes to Governor Ventura would be if he had said he hates God.[192] A former SEAL who said that "SEALS were murderers, they were killing innocent people, and that SEALs deserved to die" would be held in "extremely low" regard.[193]  Or, as Kelly phrased it, "there's a deep dislike for the man now . . . Some stuff you just can't unsay[.]"[194] "To me it's vile because it's close to my heart . . . those comments really affected me."[195] "He's no longer a SEAL to me . . . he's no longer welcome on the West Coast . . . he's not welcome at

---

188  Olsen SJ. Aff., Ex. 2, Ventura Response to Interrogatory No. 10.
189  Gassoff Tr. 132:11-25,; 134:2 - 15.
190  Paul Tr. 136:10 – 137:22.
191  Dinnell Tr. 136:11 – 137:16.
192  Lacz Tr. 120:9 - 14.
193  Lacz Tr. 122:3 - 19.
194  Kelly Tr. 128:4-10.
195  *Id.*, 200:25 – 201:22.

any reunion over there."[196] I would not "consider that SEAL to be a member of the brotherhood."[197]

Debbie Job, the mother of a fallen SEAL, offered that saying SEALs deserve to lose a few "was a cruel thing to say," the statement "made [her] think less of Mr. Ventura," and that she cannot "think of anything worse to say."[198]

"Anybody that says that their brothers deserve to die . . . that would sit wrong with anybody that heard it if was in [the SEAL] community . . . [there is nothing] worse . . . than a SEAL turning on his brothers and telling others that they deserve to die."[199] "If a former SEAL actually said something . . . to the effect that his brothers deserve to die overseas while serving their country . . . [it] would pretty much destroy his reputation in the SEAL community[.]"[200]

## D.   KYLE HAS FINANCIALLY BENEFITED FROM THE DEFAMATORY STORY.

Kyle's book was released on January 3, 2012, and between January 4 and 10, 2012, he went on national television and radio programs to promote it (transcripts reproduced in Section A, above).  In those interviews the primary, if not the only, topic of conversation was Kyle's alleged altercation with Governor Ventura -- and not his combat experience in Iraq and elsewhere.[201] The publicity Kyle received from his interviews about the alleged incident with Governor Ventura caused book sales to "go crazy" and to

---

[196] *Id.*, 201:23 – 202:16.
[197] Jones Tr. 115:4 -8.
[198] Job Tr. 56:15-25; 94:8 - 22; 95:4 - 15.
[199] Krusic Tr. 66:24 – 67:18.
[200] *Id.*, 68:8 - 13.
[201] See interview transcripts at pp. 5-11, above.

exceed all expectations, with the book's publisher organizing a marketing campaign around the Ventura story to sell more.[202] By January 22, 2012, *American Sniper* was No. 2 on the New York Times Bestseller list.[203] It went to No. 1 by January 29, 2012.[204]

The book has been on a number of "best-seller" lists,[205] and as of June 30, 2012, Royalties were in excess of $1.66 million.[206]   In June 2012 Kyle optioned the movie rights to Warner Bros. Entertainment, Inc.[207] Hollywood actor Bradley Cooper is set to produce and star in the movie adaptation.[208]

## ARGUMENT AND AUTHORITY

### A.   STANDARD OF REVIEW.

#### 1.   Minn. Stat. §§ 549.191 and 549.20.

On a motion to amend to claim punitive damages in a diversity action, the governing standard is set forth in Minn. Stat. §§ 549.191 and 549.20, which provide:

Subdivision 1. Standard.

(a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

---

[202]  Olsen SJ. Aff., Exs. 6 and 7 (January 9, 2012, email from DeFelice (co-author) to Rosenblum (HarperCollins) ("I just want to point out that while the so-called incident has helped the book go crazy, it is truly insignificant in the grand scheme of things."); January 9, 2012, email from Hubbard (HarperCollins) to Kyle ("I'm pissed they didn't order enough [copies of the book]"); January 9, 2012, email from Rosenblum (HarperCollins) to Hubbard (HarperCollins) ("honestly, who would have thought?).

[203]  Olsen Aff., Ex. V.

[204]  Olsen Aff., Ex. W.

[205]  *Id*.

[206]  Olsen Aff., Ex. X.

[207]  Olsen SJ Aff., Ex 1, Kyle's Responses to Requests for Admission No. 23; Ex. 3, Kyle's Response to Interrogatory No. 24, and Olsen Aff, Ex. Y.

[208]  Olsen Aff., Ex. Z.

(b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the rights or safety of others and:

> (1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

> (2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others.

Minn. Stat. §549.20. "A defendant operates with . . . 'deliberate disregard' by acting with intent or indifference to threaten the rights or safety of others." *Hern v. Bankers Life Cas. Co.*, 133 F. Supp. 2d 1130, 1135 (D. Minn. 2001).

### 2. The Plaintiff Need Produce Only Prima Facie Evidence of Deliberate Disregard.

In order for a party to amend its pleadings to include a claim for punitive damages, the party seeking the amendment "need not demonstrate an entitlement to such damages *per se* 'but only an entitlement to allege such damages.'" *Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 491 n.10 (8th Cir. 2004) (citing *Ulrich v. City of Crosby*, 848 F. Supp. 861, 867 (D. Minn. 1994)). As Minn. Stat. §549.191 states: "if the court finds *prima facie* evidence in support of the motion, the court shall grant the moving party permission to amend the pleadings to claim punitive damages." *Id.* The Court should not act as a fact finder, but "the evidence in support of the motion should be thoroughly examined, without considering evidence submitted in opposition." *Northwest Airlines, Inc. v. Am. Airlines, Inc.*, 870 F. Supp. 1499, 1502-03 (D. Minn. 1994).

### B. GOVERNOR VENTURA HAS PRESENTED PRIMA FACIE EVIDENCE OF KYLE'S LIABILITY FOR DEFAMATION.

Count I of Governor Ventura's Complaint is for defamation, including libel and slander.  Common law defamation requires that the statement be: (i) communicated to someone other than the plaintiff, (ii) false, and (iii) it must tend to harm the plaintiff's reputation and to lower him in the estimation of the community.  *Stuempges v. Parke, Davis & Co*., 297 N.W.2d 252, 255 (Minn. 1980); *Cavanaugh v. Burlington Northern RR Co.*, 941 F.Supp. 872, 879 (D. Minn. 1996). "Written publications calculated to expose one to public contempt or ridicule, and thus induce an ill opinion of him, and impair him in the good opinion and respect of others, are libelous, although they involve no imputation of crime, and are actionable without any allegation of special damages." *Advanced Training Sys., Inc. v. Caswell Equip. Co., Inc*., 352 N.W.2d 1, 9 (Minn. 1984) (quoting *Byram v. Aikin*, 65 Minn. 87, 67 N.W. 807 (1896)).

As declared by the Minnesota Supreme Court in *Advanced Training Sys.,* 352 N.W.2d at 9, the clearest statement of Minnesota's common law of defamation *per se* was made by Justice Mitchell in *Byram v. Aikin*, 65 Minn. 87, 67 N.W. 807 (1896):

> Written publications calculated to expose one to public contempt or ridicule, and thus induce an ill opinion of him, and impair him in the good opinion and respect of others, are libelous, although they involve no imputation of crime, and are actionable without any allegation of special damages.

*Id*. at 87, 67 N.W. at 808.

When a libel is expressed in clear and unambiguous terms, the question whether it is libel *per se* is one of law for the Court.  *See, e.g.*, *Morey v. Barnes*, 212 Minn. 153, 2 N.W.2d 829, 831 (1942) ("[W]here a publication clearly defames a person . . . the court should instruct the jury that it is libelous as a matter of law."); *Sharpe v. Larson*, 67

Minn. 428, 70 N.W. 1, 1 (1897) ("If the publication is obviously defamatory, it is the duty of the trial judge, in a civil action, to direct the jury, as a matter of law, that it is libel per se . . . ."). Words which are clearly defamatory on their face are defamatory *per se*, meaning they are defamatory as a matter of law. *See Morey*, 2 N.W.2d at 831 ("To be libelous per se, words must be of such a nature that the court can say, as a matter of law, that they will tend to disgrace and degrade the party defamed . . . .").

Kyle's story is not protected by the First Amendment if it is knowingly false or was written with reckless disregard for the truth. *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Gertz v. Robert Welch, Inc*., 418 U.S. 323 (1974). In this regard, "[p]rofessions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination . . . [.]" *Chafoulias v. Peterson*, 668 N.W. 2d 642, 655 (Minn. 2003).

"Epithets or adjectives can constitute defamation if they imply a specific type of reprehensible conduct." *Weissman v. Sri Lanka Curry House, Inc*., 469 N.W.2d 471, 473 (Minn. Ct. App. 1991) (citing *Uhlman*, 148 N.W. at 102). Taken as a whole, Kyle's *Scruff Face* sub-chapter "implies a specific type of reprehensible conduct," *i.e*., that Governor Ventura deliberately inflicted emotional harm on the families and friends of a fallen American serviceman, at his wake. *Weissman*, 469 N.W.2d at 473. As a whole, the *Scruff Face* sub-chapter was "calculated to expose [Governor Ventura] to public contempt or ridicule, and thus induce an ill opinion of him, and impair him in the good opinion and respect of others[.]" *Byram*, 67 N.W. at 808.

"With regard to false accusations of a crime, 'the words need not carry upon their face a direct imputation of a crime.'" *Longbehn v. Schoenrock*, 727 N.W.2d 153, 158 (Minn. Ct. App. 2007) (quoting *Larson v. R.B. Wrigley Co.*, 183 Minn. 28, 29, 235 N.W. 393, 394 (1931). "[T]he test is not whether the speaker intended to make an accusation, but whether a reasonable person under similar circumstances would understand the statement as making an accusation or imputing criminal . . . misconduct to another." *Id.* at 159.

Few crimes in this Country are as reviled as treason, which is why it is one of the very few federal crimes that carry the death penalty. *See, e.g*., 18 U.S.C. § 2381. In no uncertain terms, the *Scruff Face* sub-chapter, taken as a whole, accuses Governor Ventura of giving aid and comfort to enemies of the United States, because the intent and import of the written work is that Governor Ventura hates America, wishes death upon American soldiers and is happy that some have already died in Iraq and elsewhere in the middle east.

In short, the fabricated incident described in the *Scruff Face* sub-chapter portrays former Navy SEAL and former Governor of the State of Minnesota Jesse Ventura not only as a coward and a weakling, but as a traitor to the United States of America, the oath he took to defend the United States and its Constitution, and to each and every past, present and future member of its military personnel. The *Scruff Face* sub-chapter, taken as a whole, is therefore defamatory *per se* and is actionable without any allegation of special damages. *See, e.g., Prinzing v. Schwab,* No. A05-398, 2006 WL 538926 at *4 (Minn. Ct. App. Mar. 7, 2006) (in suit for defamation the jury was free to consider

evidence that the "statement is fabricated, is a product of the defendant's imagination, or is so inherently improbable that only a reckless person would publish it, or . . . evidence of obvious reasons to doubt the veracity of a statement.").

## C.     GOVERNOR VENTURA HAS PRESENTED PRIMA FACIE EVIDENCE OF KYLE'S LIABILITY FOR MISAPPROPRIATION.

Count II of Governor Ventura's Complaint is captioned "Misappropriation of Name and Likeness (Appropriation Branch of Right of Privacy)."  That cause of action was recognized by Minnesota's Supreme Court more than a decade ago in *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231 (Minn. 1998), and the elements are: (1) appropriation; (2) of another's name and likeness; (3) for one's own use or benefit; (4) without consent. There is no requirement under Minnesota law that the appropriation be for advertising or other commercial purposes.[209]

Here, it has been shown that Kyle used Governor Ventura's name, likeness and public persona to gain publicity for his book, and that he did so with great success.  To date, royalties from book sales have exceeded $1.66 million.  Driving those sales have been Kyle television and radio appearances, which were widely viewed and even more widely reported on and discussed.  In each interview, the primary topic of discussion was Kyle's story about his alleged encounter with Governor Ventura.  Within two weeks, Kyle's book went to No. 2 on the New York Times Bestseller list, and within three weeks

---

[209] *Id.  See also, Faegre & Benson, LLP v. Purdy*, 447 F.Supp.2d 1008, 1017-18 (D. Minn. 2006) ("Appropriation protects an individual's identity and is committed when one 'appropriates to his own use or benefit the name or likeness of another.'"); Minn. CIV JIG 72.15;  *Restatement (Second) of Torts*, § 652(c) (1977).

went to No. 1 -- driven primarily by the publicity he received, and the controversy he generated by telling his false and defamatory story about Governor Ventura.

## D.    LEAVE TO AMEND TO CLAIM PUNITIVE DAMAGES SHOULD BE GRANTED.

### 1.    Punitive Damages are Available for Defamation.

It is well established that punitive damages are appropriate in defamation cases as a means of deterring "false, malicious, and provocative attacks on a person's reputation." *Loftsgaarden v. Reiling*, 126 N.W.2d 154, 154 (Minn. 1964); *Longbehn v. Schoenrock*, 727 N.W.2d 153, 160 (Minn. Ct. App. 2007).  In defamation cases, the policy behind punitive damages is to "deter false, malicious, and provocative attacks on a person's reputation." *Loftsgaarden*, 267 Minn. at 182-83, 126 N.W.2d at 154-55.

Under Minnesota law, a plaintiff may recover punitive damages for defamation where the defendant acted with actual malice; that is, where the defendant made "defamatory statements either knowing the statements were false or acting recklessly with regard to whether the statements were true."  *Stokes v. CBS Inc.*, 25 F. Supp. 2d 992, 1003 (D. Minn. 1998).  Further, "punitive damages can be awarded in cases of defamation *per se* without proof of actual damage to the plaintiff."  *Hern*, 133 F. Supp. 2d at 1135 (quoting *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 259 (Minn. 1980)).  As explained above, the prima facie evidence offered by Governor Ventura is more than sufficient to permit a jury to conclude that Kyle is liable for defamation.

### 2.      Punitive Damages are Available for Misappropriation.

Punitive damages are appropriate where a defendant intentionally appropriates the name and likeness of another without permission.  In Minnesota, "[a] substantial body of . . . jurisprudence on intentional torts has recognized punitive damages as a proper remedy for intentional violations of the rights of others."  *Molenaar v. United Cattle Co.*, 553 N.W.2d 424, 427 (Minn. Ct. App. 1996).  The general rule in jurisdictions recognizing a right of privacy cause of action for appropriation of one's name and likeness hold that a plaintiff may seek punitive damages.  *See, e.g.*, *Thornton v. W. & S. Fin. Group Beneflex Plan*, 797 F. Supp. 2d 796, 815 (W.D. Ky. 2011) ("[A] plaintiff asserting a claim for appropriation of a person's name or likeness may seek nominal, compensatory, and, if appropriate, punitive damages."); *James v. Bob Ross Buick, Inc.*, 855 N.E.2d 119, 123 (Ohio Ct. App. 2006) (same).  As explained above, the prima facie evidence offered by Governor Ventura is more than sufficient to permit a jury to conclude that Kyle is liable for misappropriation.

### CONCLUSION

For all of the foregoing reasons, leave should be granted to amend the Complaint to seek punitive damages.

**HENSON & EFRON, P.A.**

Dated:  November 30, 2012

By    s/ David Bradley Olsen
    David Bradley Olsen, 197944
    Court J. Anderson, 331570
    John N. Bisanz, Jr., 0389098
220 South Sixth Street, Suite 1800
Minneapolis, Minnesota  55402-4503
Telephone:  612-339-2500
Facsimile:   612-339-6364
 e-Mail: dolsen@hensonefron.com
        jbisanz@hensonefron.com

Attorneys for Plaintiff Governor Jesse Ventura,
a/k/a James G. Janos

460078.DOC