**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

---

Jesse Ventura a/k/a James
G. Janos,

                      Plaintiff,

v.

Taya Kyle, Executrix of the Estate of
Chris Kyle,

                      Defendant.

Civ. No. 12-472 (RHK/JJK)
**MEMORANDUM OPINION
AND ORDER**

---

David Bradley Olsen, Court J. Anderson, John N. Bisanz, Jr., Henson & Efron, PA, Minneapolis, Minnesota, for Plaintiff.

John P. Borger, Mary Andreleita Walker, Faegre Baker Daniels LLP, Minneapolis, Minnesota, for Defendant.

---

## INTRODUCTION

This defamation action arises from a passage in decedent Chris Kyle's autobiography describing an altercation with Plaintiff Jessie Ventura during a Navy SEAL's wake. In his book, Kyle wrote that Ventura made offensive comments about the SEALs and their service in the Iraq war, so Kyle "laid him out." Ventura claims Kyle fabricated the encounter to gain publicity. He commenced this action against Kyle asserting claims for defamation, appropriation, and unjust enrichment. While this action was pending, Kyle was tragically killed, and his wife, Taya Kyle, acting as executrix of his estate, now moves for summary judgment on Ventura's claims. For the reasons that follow, her Motion will be denied.

# BACKGROUND

Jesse Ventura is a well-known former wrestler, actor, and Governor of Minnesota, who served as a member of the Navy Special Forces Underwater Demolition/SEAL Teams during the Vietnam War. Chris Kyle was a Navy SEAL sniper and author of an autobiography entitled <u>American Sniper, the Autobiography of the Most Lethal Sniper in U.S. Military History</u>. The book, which was released January 3, 2012, reached number one on the New York Times' Bestseller list by January 29, 2012, and in June 2012, Warner Brothers purchased the rights to a film adaptation.

In <u>American Sniper</u>, Kyle wrote a subchapter captioned "Punching Out Scruff Face" about an alleged altercation with Ventura. According to Kyle, the encounter took place at McP's, a bar in Coronado, California, on October 12, 2006, during a wake for Kyle's comrade, Mike Monsoor, who was killed in the line of duty. The subchapter reads as follows:

> AFTER THE FUNERAL WE WENT TO A LOCAL BAR FOR THE WAKE proper.
>     As always, there were a bunch of different things going on at our favorite nightspot, including a small party for some older SEAL's and UDT members who were celebrating the anniversary of their graduation. Among them was a celebrity I'll call Scruff Face.
>     Scruff served in the military; most people seem to believe he was a SEAL. As far as I know, he was in the service during the Vietnam conflict but not actually in the war.
>     I was sitting there with Ryan and told him that Scruff was holding court with some of his buddies.
>     "I'd really like to meet him," Ryan said.
>     "Sure." I got up and went over to Scruff and introduced myself.
>     "Mr. Scruff Face, I have a young SEAL over here who's just come back from Iraq. He's been injured but he'd really like to meet you."
>     Well, Scruff kind of blew us off. Still, Ryan really wanted to meet him, so I brought him over. Scruff acted like he couldn't be bothered.

> *All right.*
> We went back over to our side of the bar and had a few more drinks. In the meantime, Scruff started running his mouth about the war and everything and anything he could connect to it. President Bush was an asshole. We were only over there because Bush wanted to show up his father. We were doing the wrong thing, killing men and women and children and murdering.
> And on and on. Scruff said he hates America and that's why he moved to Baja California. 9/11 was a conspiracy.
> And on and on some more.
> The guys were getting upset. Finally, I went over and tried to get him to cool it.
> "We're all here in mourning," I told him. "Can you just cool it? Keep it down."
> "You deserve to lose a few," he told me. Then he bowed up as if to belt me.
> I was uncharacteristically level-headed at that moment.
> "Look," I told him, "why don't we just step away from each other and go on our way?" Scruff bowed up again. This time he swung.
> Being level-headed and calm can last only so long. I laid him out.
> Tables flew. Stuff happened. Scruff Face ended up on the floor.
> I left.
> Quickly.
> I have no way of knowing for sure, but rumor has it he showed up at the BUD/S graduation with a black eye.

(Borger Decl., Ex. A-2.) Although he does not name Ventura in print, Kyle has confirmed in television, radio, and print interviews that "Scruff Face" is Ventura. (Kyle Decl. ¶ 15.) In early January 2012, Kyle appeared on the Opie & Anthony Show, a talk-radio program, and the O'Reilly Factor, a talk show, retelling the above-quoted story about Ventura and repeating Ventura's alleged statement, "You deserve to lose a few guys." (Compl. Exs. B, C; Kyle Decl. ¶ 19.) The story also appeared on FOX News. (Compl. Ex. D.)

Kyle maintained that "the events that happened in [the] book are true" and that "the essence of what was said is accurate." (Borger Decl., Ex. A-2; Kyle Decl. ¶¶ 9–10).

- 3 -

He testified in his deposition that he was standing on the sidewalk outside the bar with four or five people around and Ventura was talking loudly about how he disagreed with President Bush, the Iraq War, and the SEALs' tactics.  Ventura told him they "deserved to lose a few" and took on an aggressive posture.  At this point, he thought Ventura might hit him, so he punched Ventura in the face, knocking him to the ground, and then turned and ran down the street toward Danny's (another SEAL bar nearby where Kyle and others continued to drink after McP's that night).

Kyle could identify only one witness who had heard Ventura say, "You deserved to lose a few," and saw him punch Ventura:  Jeremiah Dinnell.  Dinnell testified that he saw Kyle and Ventura arguing on the patio, heard Ventura say that "with what [they] were doing overseas [they] deserve to lose a few guys," and then saw Kyle punch him in the face, underneath the eye.  (Dinnell Dep. 122–26.)  Dinnell could not recall if or how Ventura fell after the punch or whether there was any blood.  (Id. at 126–28.)  Dinnell did not see where Kyle went afterward but he, Dinnell, took off toward Danny's.  (Id. at 127–28.)  Laura deShazo also stated she saw an unidentified male hit Ventura at McP's that night (L. deShazo Decl. ¶¶ 5–6),[1] and several witnesses testified to seeing Ventura getting up from the ground and Kyle leaving (Lacz Dep. at 49; Kelly Dep. at 84, 89–90; Paul Dep. at 115).  Still others who were at McP's did not witness any altercation but

---

[1] Ventura objects to the consideration of Laura deShazo's declaration because it was produced long after discovery had closed.  He indicates he will move to preclude her from testifying at trial unless given an opportunity to depose her first.  The declaration has no impact on the outcome of this Motion, and the Court's citation to the declaration should not be construed as a ruling on the admissibility of her testimony at trial—that issue will be decided if and when it is properly before the Court.

testified to hearing about it from Kyle or other SEALs later that night at Danny's or at breakfast the following morning. (Lee Dep. at 121–23; Budinscak Dep. at 69–74.) Although Dinnell was the only one who allegedly heard Ventura say the SEALs "deserved to lose a few," several of Kyle's witnesses testified to hearing Ventura express disagreement with President Bush, the Iraq War, and the SEALs' tactics. (Lacz Dep. at 105–08; Kelly Dep. at 147–49; Paul Dep. at 105–08; Budinscak Dep. at 56; R. deShazo Decl. ¶ 6.)

Ventura denies both the statements attributed to him and that Kyle ever laid a hand on him. According to Ventura, he spent the weekend attending events for the BUD/S Class 258 graduation and the bicentennial reunion of his BUD/S class, Class 58. (9/18/12 Olson Aff. Ex. 3.) Although Ventura could not remember specific dates, his rental-car records reflect that he arrived in San Diego at approximately 7:30 p.m. on October 12, 2006. (Ventura Dep. at 38.) Ventura recalls going to McP's with his friends who were also there for the reunion, the DeWitts and Mike Gotchey. (Id. at 45.) Although he could not recall which night he was at McP's—either the night before or after the graduation ceremony—he was certain that when he was at McP's, the DeWitts were there with him and that a group of younger SEALs were there for a wake. (Id. at 45, 47.) He recalls spending the evening engaged in conversation with his friends on the patio of McP's and meeting several people who approached their table to talk to him. (9/18/13 Olson Aff. Ex. 3.) He denies having any verbal or physical confrontation with Kyle or anyone else that night. (Id.)

The DeWitts and Gotchey averred that they went to McP's with Ventura *after* the BUD/S graduation ceremony, but Ventura maintains this was an error, as later discovered evidence including photographs, the program of events for their BUD/S class reunion, and the date of Monsoor's wake, all indicated that they were at McP's on October 12, the night *before* the ceremony. Gotchey and the DeWitts averred they were with Ventura the entire evening and that the events described in <u>American Sniper</u> never happened. (C. DeWitt Aff. ¶¶ 34–4; B. DeWitt Aff. ¶¶ 9–10, 12; Gotchey Aff. ¶¶ 6, 8.) They recall several of the younger SEALs and others approached Ventura to meet him, but do not recall whether Kyle was one of them. (Gotchey Aff. ¶¶ 9–11.) They state Ventura did not exchange hostile words with anyone, was not involved in any physical altercation, and never stated the SEALs were murdering innocent people or deserved to lose a few. (C. DeWitt Aff. ¶ 4; B. DeWitt Aff. ¶¶ 9–10, 13; Gotchey Aff. ¶ 12.) Ventura has also produced the declaration of Robert Leonard, who was at McP's that night until 11 p.m. and does not recall any arguments or physical fights, nor does he recall hearing Ventura make any offensive comments. (Leonard Aff. ¶¶ 6–7.)

The following day at the BUD/S graduation ceremony, no witness observed any indication that Ventura had been punched in the face, such as bruising, swelling, or abrasions, including Wayne Robertson, who stood next to Ventura for photos and interacted with him throughout the day. (Leonard Aff. ¶ 10; Robertson Aff. ¶ 5.) And none of Ventura's witnesses heard mention of a fight at McP's. (Leonard Aff. ¶¶ 8-9; Robertson Aff. ¶ 6.) Ventura has submitted photographs of himself taken at McP's and at the graduation ceremony the next day, in which no injuries are visible. As Ventura was

on blood-thinning medication at the time, he maintains that a punch in the face from a "220-pound trained killer" would have resulted in noticeable bruising and/or bleeding. (Pl.'s Mem. at 16; Gotchey Aff. ¶ 14.)

Ventura commenced the instant action against Kyle in February 2012, asserting claims of defamation, appropriation, and unjust enrichment. Kyle moved for partial summary judgment in the fall of 2012, which Motion was denied. In February 2013, Kyle was killed by a fellow veteran, against whom criminal charges are currently pending in Texas. His wife, Taya Kyle, was appointed executrix of his estate and substituted as the Defendant in this action in July 2013. Discovery has since been completed, and Taya Kyle now moves for summary judgment on Ventura's claims.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist

creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

**I.     Defamation**

Where the plaintiff is a public figure, which the parties agree Ventura is, a defamation claim requires:  (1) a false and defamatory statement about the plaintiff; (2) an unprivileged publication of that statement to a third party; (3) a tendency to harm the plaintiff's reputation in the community; and (4) the defendant acted with "actual malice."  Stepnes v. Ritschel, 663 F.3d 952, 963 (8th Cir. 2011); accord Richie v. Paramount Pictures Corp., 544 N.W.2d 21, 25 (Minn. 1996).  The burden is on the plaintiff to prove each of these elements.  Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Here, Defendant disputes whether Kyle's statements were false and whether he acted with actual malice.

   *i. Material Falsity*

To succeed on a defamation claim, a plaintiff must prove the defendant's statement was materially false.  Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517 (1991).  The plaintiff must demonstrate more than minor inaccuracies or alterations, unless they "result[] in a material change in the meaning conveyed by the statement." Id.; see also Air Wis. Airlines Corp. v. Hoeper, __ U.S. __, 134 S.Ct. 852, 861 (2014) (discussing material falsity standard).  Defendant asserts Kyle's statements were substantially true and Ventura cannot prove otherwise.  While Defendant has presented

testimony supporting the truth of Kyle's statements, Ventura has also presented testimony and corroborating evidence contravening it.

Ventura has submitted sworn statements of several people present at McP's with him (Mike Gotchey, Bill DeWitt, Charlene DeWitt, and Robert Leonard) who deny hearing him make the statements Kyle attributed to him in American Sniper and deny seeing Kyle punch him.  Defendant urges the Court to discount the affidavits of Gotchey and the DeWitts, arguing their testimony does not pertain to the night in question.  Defendant maintains their statements do not refute Kyle's story because they described going to McP's with Ventura *after* the graduation ceremony, which was on October 13th, while Kyle's story recounts the events of the night *before*, on October 12th.[2]  (Gotchey Aff. ¶ 6; B. DeWitt Aff. ¶ 5; C. Dewitt Aff. ¶ 2.)

But viewing their affidavits in the context of the record as a whole, it appears more likely that Gotchey and the DeWitts were simply mistaken as to the date.  First, Ventura himself initially believed that he was at McP's with Kyle on October 13th (e.g., Plaintiff's Interrogatories to Defendant, First Set, No. 9., Doc. No. 63-1), and later corrected the date to October 12th.  Second, in their statements, the DeWitts describe being at McP's during a wake for a young SEAL (B. DeWitt Aff. ¶ 6; C. Dewitt Aff. ¶ 5), and Monsoor's wake indisputably occurred on the 12th.  Third, the program of events for the reunion Ventura, Gotchey, and the DeWitts were attending advertised a gathering at

---

[2] The Court notes that Magistrate Judge Boylan rejected this argument over a year ago, in his Order denying Defendant's Motion to Strike Ventura's interrogatory answers correcting the date—a decision which Defendant neglected to mention while resurrecting the issue. (Doc. No. 136, at 3–5 & n.1.)

McP's on the 12th.  (Olsen Aff. Ex. O.)  Finally, although Ventura could not recall in his deposition exactly which date he was at McP's, he testified that the DeWitts were there with him, and the testimony of other witnesses as well as photos taken establish he was at McP's on the 12th.  The Court may reasonably infer from this evidence that Gotchey's and the DeWitts' statements describe the events of October *12th*, not October *13th*.

Accordingly, the Court considers these affidavits as evidence in Ventura's favor, along with the affidavits of Leonard and Robertson, and Ventura's own testimony.  But the evidence in the case does not come down to just eyewitness statements on both sides; Ventura has also submitted corroborating photographs of himself at the graduation ceremony the following day in which no injuries are visible, despite Kyle's allegation that he punched Ventura (not a small man himself) in the face with such force that he knocked him to the ground.  Altogether, Ventura has proffered sufficient evidence upon which a jury could conclude that Kyle's statements were materially false.

   *ii. Actual Malice*

Assuming for the sake of argument that Kyle's statements were false, Defendant asserts Ventura cannot prove Kyle acted with actual malice.  To prove actual malice, the plaintiff must prove by clear and convincing evidence that the defendant knew the statements were false or acted in "reckless disregard" of whether they were true or false—that is, he "entertained serious doubts as to the truth of his publication."  Masson, 501 U.S. at 510 (internal quotation omitted).  Essentially, Ventura must prove Kyle was aware his statements in American Sniper were probably false.  Defendant argues that

Ventura has not presented sufficient evidence of actual malice because his evidence only relates to the truth of Kyle's statements and not Kyle's state of mind specifically.

Defendant's assertion that actual malice cannot be inferred from a false statement is only true if the statement relates to an ambiguous event. Under such circumstances, a defendant could unknowingly misinterpret the event, leading to a statement that is false but made without actual malice. See, e.g., Peeler v. Spartan Radiobroadcasting, Inc., 478 S.E.2d 282, 285 (S.C. 1996) ("[E]vidence showing that the publisher and the plaintiff disagreed with respect to their perception of events which they both observed" was not sufficient to show actual malice); Mahoney v. Adirondack Publ'g Co., 517 N.E.2d 1365, 1369 (N.Y. 1987) (inference that an eyewitness acted with actual malice depends "on the premise that the eyewitness could not have perceived and understood anything but the truth" which is valid "only if the events were unambiguous and the setting was such that the observer could not have misperceived those events"). But Kyle's story does not recount an ambiguous event. While it is *possible* Kyle could have misinterpreted Ventura's comments to him and innocently published a false account of them, this reasoning does *not* apply to Kyle's account of "punching out" Ventura. If Ventura proves *that* statement was false—that is, if a jury does not believe Kyle punched Ventura—it follows that Kyle fabricated it. See Robert D. Sack, Sack on Defamation, § 5.52, at 5-83–84 ("[I]f the defendant is an eyewitness to an *unambiguous* event which he or she then misreports, a finding of actual malice may arise from testimony of other witnesses establishing that the event did not happen as described: It follows that the description was fabricated.") (emphasis added). And if a jury concludes Kyle fabricated

part of the story, it could reasonably conclude he fabricated the rest of his story about Ventura.

In conclusion, Ventura has presented sufficient evidence to create a genuine issue of fact as to whether Kyle knowingly (or recklessly) published false statements about him. Accordingly, his defamation claim will be left for a jury to resolve.

## II.     Appropriation and Unjust Enrichment

The Court previously denied Kyle summary judgment on Ventura's appropriation and unjust-enrichment claims, and the only new argument Defendant raises in this Motion is regarding the damages available to Ventura. Defendant asserts Ventura should be allowed to recover (if at all) only proceeds from the book American Sniper and not from the film contract. In response, Ventura argues that the "publicity Kyle received from his interviews about the alleged incident with Ventura caused book sales to 'go crazy,'" which success led to Warner Brothers optioning the film rights. (Pl.'s Mem. at 49 (quoting Olsen Aff. Ex. GG (email from co-author Jim DeFelice to the publisher stating, "I just want to point out that while the so-called [Ventura] incident has helped the book go crazy, it is truly insignificant in the grand scheme of things.")).) Although Ventura does not provide any specific evidence linking Warner Brothers' interest in a film adaptation to the Ventura story, the Court does not find his claim for damages too remote. See Jackson v. Reiling, 249 N.W.2d 896, 897 (Minn. 1977) (plaintiff cannot recover damages that are "remote, conjectural, or speculative"). If the Ventura story garnered publicity and dramatically increased book sales, it does not stretch logic to believe it could have generated Kyle's Warner Brothers contract also. See id. ("There is

no general test of remote and speculative damages, and such matters should usually be left to the judgment of the trial court.").

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. No. 180) is **DENIED**.

Dated: March 19, 2014

                                                          s/Richard H. Kyle
                                                          RICHARD H. KYLE
                                                          United States District Judge