## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jesse Ventura, a/k/a James G. Janos, an individual,

                Plaintiff,

vs.

Taya Kyle, as Executor of the Estate of Chris Kyle,

                Defendant.

**Civil No. 12-cv-0472 RHK/JJK**


**DEFENDANT'S TRIAL BRIEF**

## <u>Introduction</u>

In his autobiography AMERICAN SNIPER, Chris Kyle described a 2006 encounter at McP's Irish Pub & Grill in Coronado, California, with a man who made an aggressive gesture and insensitive comments about the military in the presence of mourning family and friends of deceased Navy SEALs. In some later media interviews, he said the encounter was with Jesse Ventura. This Trial Brief will use the term "the Published Statements" to collectively refer to the challenged portions of the Book and of the media interviews.

Ventura claims that Kyle lied about the whole encounter. To prevail on his defamation claim, Ventura must establish the falsity and defamatory nature of Kyle's account. He also must establish that Kyle *did not believe* that the encounter transpired substantially as Kyle described – that is, that Kyle made the statements with a high degree of subjective awareness of the statements' probable falsity.

Although Ventura also claims that Kyle unfairly used Ventura's name to increase sales of AMERICAN SNIPER (including movie rights to the Book), the evidence will show that the public embraced Kyle's book for reasons completely unrelated to any passing reference to Ventura. That evidence includes financial records showing that Kyle's book was far more successful than any book that Ventura wrote (and that carried Ventura's name and/or picture on the cover). Any reference to Ventura was incidental to protected expressive activity, and does not support liability for misappropriation or for unjust enrichment. To the best of the knowledge of the undersigned defense counsel, no plaintiff in circumstances similar to Ventura's has ever prevailed on claims for misappropriation or unjust enrichment.

The central issues at trial likely will be:

1. What happened at McP's on October 12, 2006?

2. What did Chris Kyle know and believe when he wrote the Book and made his comments during media interviews?

3. How did the Published Statements affect Ventura?

4. Did Chris Kyle misappropriate Ventura's name or use Ventura's name to unjustly enrich himself?

## Statement of the Issues, Facts Expected to be Proved, and Controlling Statutory and Case Law

### I.     Liability – Count I (Defamation)

#### A.     Elements of claim

The Eighth Circuit summarized the elements of a defamation (libel) claim in

*Stepnes v. Ritschel*[1] as requiring:

> (1) a false and defamatory statement about the plaintiff; (2) an unprivileged publication to a third party; (3) a tendency to harm the plaintiff's reputation in the community; and (4) fault amounting to at least negligence. … If the plaintiff is a public figure [or public official], he must show through clear and convincing evidence that the defendant's fault amounted to actual malice. … Actual malice requires acting with "knowledge that the statements were false or ... reckless disregard of whether they were true or false." … Accordingly, the plaintiff must show that the "defendant in fact entertained serious doubts as to the truth of his publication."

Ventura concedes that he is a public figure.[2] The burden is on Plaintiff to prove each

element.[3]

Not every element is necessarily in dispute in this case. Defendant acknowledges

that Chris Kyle – in his book and during his interviews with Opie & Anthony and with

Bill O'Reilly – made statements to third parties and that those statements included

statements that were about Ventura. Those elements need not be submitted to the jury as

to the Published Statements identified in the Complaint, ¶¶30(a), 30(b).

---

[1]     *Stepnes v. Ritschel*, 663 F.3d 952, 963 (8th Cir. 2011) (internal citations omitted).

[2]     ECF #269 at 8.

[3]     ECF #269 at 8, *citing Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

US.53888124.14

## B.      Disputed element: Defamatory meaning

"Words are defamatory when they tend to injure the plaintiff's reputation and expose the plaintiff to public hatred, contempt, ridicule, or degradation." *Church of Scientology of Minn. v. Minnesota State Med. Ass'n Found.*, 264 N.W.2d 152, 155 (Minn. 1978); *see also* Prosser and Keeton on Torts § 111 at 775 (5th ed. 1984) (stating that some "element of personal disgrace [is] necessary for defamation; ... the fact that the plaintiff finds it unpleasant and offensive is not enough").

Words can be defamatory without being false: "Tom Petters swindled thousands of people out of millions of dollars." Words can be false without being defamatory: "Tom Petters has blond hair." Although the "defamatory character of any particular statement must be construed in the context of the article as a whole,"[4] a publication as a whole will not support liability simply because it contains some statements that are false-but-not-defamatory and other statements that are defamatory-but-true. A cause of action for libel requires both falsity and defamatory character (and other elements such as fault) be present in the same particular statement. [5] Furthermore, when the individual statements

---

[4]      *Jadwin v. Minneapolis Star & Tribune Co.*, 390 N.W.2d 437, 443 (Minn. App. 1986) ("The defamatory character of any particular statement must be construed in the context of the article as a whole."). Challenged statements must be taken as part of a whole, including tone and the use of cautionary language, and the context of the speech is "critically important." *Brodkorb v. Minn.*, Civ. No. 12-cv-01958-SRN-AJB, ECF #39, 2013 WL 588231, at *14 (D. Minn. Feb. 13, 2013).

[5]      *Aviation Charter, Inc. v. Aviation Research Grp./US*, 416 F.3d 864, 870 (8th Cir. 2005) ("[A]ny potential harm caused by the improper characterization was overshadowed by at least three other eye-catching observations highlighted in the *Star Tribune* article."); *Carradine v. State*, 511 N.W.2d 733, 737 (Minn. 1994) ("if a jury properly might find that the additional statements significantly added to any injury sustained by plaintiff over

4

within a communication are not actionable, the Minnesota Supreme Court has rejected an argument that the totality of defendant's statements made his entire communication actionable.[6]

In response to Defendant's interrogatories, Ventura discussed fifteen separate allegedly false and defamatory statements.[7] The fifteen statements were:

1. Ventura said that he "hates America."

2. Ventura said Navy SEALs "deserve to lose a few."

3. Ventura said Navy SEALs "deserve to lose a few guys."

4. Ventura said "ya'll [Navy SEALs] deserve to lose a few guys."

5. Ventura said Navy SEALs "were killing innocent people."

6. Ventura said Navy SEALs "were murderers."

7. Ventura said "We were doing the wrong thing, killing men and women and children and murdering."

8. Ventura "bowed up as if to belt" Kyle.

9. Ventura "bowed up again."

10. Ventura "swung" at Kyle.

11. "Stuff happened. Scruff Face ended up on the floor."

12. Ventura "showed up at the BUD/S graduation with a black eye."[8]

---

and above any injury sustained as a result of the absolutely privileged statements, then plaintiff should be allowed to proceed to trial against [defendant]; otherwise, not").

[6]    *McKee v. Laurion*, 825 N.W.2d 725, 733-34 (Minn. 2013).

[7]    ECF #97-2 Ex. O at pp.14-16.

[8]    Ventura's answer to interrogatory 7(a) asserted that the statement was false because: "The BUD/S graduation occurred earlier in the day and before he went to McP's. The incident, as described by Kyle, is a fabrication."

US.53888124.14

13. Kyle "was in a bar fight with Jesse Ventura," Kyle "punched him … in the face," "he went down," Kyle "knocked him down," Kyle "popped him," and/or "he [Ventura] went down."

14. Ventura threatened or assaulted Kyle.

15. Kyle physically assaulted, battered, or punched Ventura.

The 15 statements overlap to some extent, and sometimes paraphrase Kyle's actual words. They generally are consistent with the allegations of the Complaint, ¶¶30(a), 30(b). Defendant's proposed Special Verdict form condenses this list to six basic statements.

The list on the Special Verdict form might be reduced further, either by agreement among counsel or by the Court, prior to submission to the jurors. For example, Ventura has conceded that the statement that Kyle hit him caused him no injury.[9] Consequently, although that statement (essentially, a summary or paraphrase of Statements 11, 12, 13, and 15) might play a role in evaluating the issues of material falsity and actual malice with respect to other statements (such as the "deserve to lose a few" comment),[10] it cannot itself be the foundation for imposing liability or awarding damages. Other statements similarly should be non-actionable in themselves because they are not defamatory or are immaterial details.

---

[9]   *See* ECF #238 (Plaintiff's Memorandum opposing summary judgment) at 45-47.

[10]   *See* ECF #269 at 11-12.

US.53888124.14

The Court should avoid juror confusion by pruning the statements to be submitted to the jury and using a special verdict form that ensures that the jurors evaluate each element of the libel claim for every disputed statement.[11]

## C.     Disputed element: Material falsity

To succeed on a defamation claim, a plaintiff must prove the defendant's statement was materially false. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). The plaintiff must demonstrate more than minor inaccuracies or alterations, unless they "result[] in a material change in the meaning conveyed by the statement." *Id.*; *see also Air Wis. Airlines Corp. v. Hoeper*, __ U.S. __, 134 S. Ct. 852, 861 (2014) (discussing material falsity standard).[12]

---

[11]     Defendant acknowledges that, in an early discovery order, the Court denied Defendant's motion to compel Ventura to provide supplemental answers to interrogatories that would detail each separate aspect of the Published Statements and concluded that "Ventura has provided adequate explanations of the factual bases for his claims that Kyle's statements were defamatory, caused him damage, and harmed his reputation." ECF # 47 at 2. However, Plaintiff's recovery of compensatory damages for injury to his reputation must be based upon the specific allegedly defamatory Published Statements at issue, and not from other statements or from altogether separate causes. *See* n.5 above. Thus, the jury still must find every element of defamation present in a particular statement, and the Court must be satisfied that the jury has done so. *Cf. Moore v. Hoff*, 821 N.W.2d 591, 599 (Minn. App. 2012) ("When constitutionally protected speech is arguably intertwined with tortious conduct, it is the district court's burden to 'adequately disclose the evidentiary basis for concluding' that there was independent tortious activity in order to 'avoid[] the imposition of punishment for constitutionally protected activity.'"), *quoting NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 933-34 (1982). Defendant's proposed Special Verdict form would facilitate that process.

[12]     ECF #269 at 8.

US.53888124.14

The First Amendment protects mere rhetorical hyperbole, statements that cannot reasonably be interpreted as stating actual facts, statements of subjective opinion and point of view, and supportable interpretations of ambiguous underlying situations.[13]

Defendant asserts that Kyle's statements were not materially false, and that Ventura cannot prove otherwise. In moving for summary judgment, Defendant "presented testimony supporting the truth of Kyle's statements,"[14] and will do so again at trial. The Court concluded that "Ventura has proffered sufficient evidence upon which a jury *could* conclude that Kyle's statements were materially false."[15]

Ventura must establish material falsity by clear and convincing evidence.[16]

---

[13]      *Hunter v. Hartman*, 545 N.W.2d 699, 707 (Minn. App. 1996); *Nygard v. Walsh*, No. A13-1103, 2014 WL 349761, at *4-*5 (Minn. App. Feb. 3, 2014). *Nygard* affirmed summary judgment for defendant, because "where an eyewitness saw Nygard take a full swing at his child and the child bleeding; where neighbors reported episodes of yelling that created concerns about the safety of Nygard's son; and where an investigating officer corroborated the yelling; Nygard's proffered evidence [affidavits from himself, his wife, and his son denying that he ever struck his son] cannot create a genuine issue of material fact sufficient to withstand summary judgment. Even giving Nygard the benefit of all reasonable inferences, we conclude, as a matter of law, that he is unable to show that it is highly probable that Walsh's underlying statement that Nygard hit his son was false." 2014 WL 349761, at *5.

[14]      ECF #269 at 8-9.

[15]      ECF #269 at 10 (emphasis added).

[16]      There is "some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence." *Harte-Hanks Commc'ns. v. Connaughton*, 491 U.S. 657, 661 n.2 (1989) (expressing no view on the issue). "Most courts that have addressed the issue, however, have required the higher standard of proof." R. Sack, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS §3:4 at 3-14 – 3-15 & n.52 (4th ed. 2010 & Supp. 2013).

**D.     Disputed element: Knowledge of falsity/high degree of subjective awareness of probable falsity**

A public-figure plaintiff such as Ventura "must show through clear and convincing evidence that the defendant's fault amounted to actual malice. … Actual malice requires acting with 'knowledge that the statements were false or ... reckless disregard of whether they were true or false.' … Accordingly, the plaintiff must show that the 'defendant in fact entertained serious doubts as to the truth of his publication.'"[17] "[R]eckless disregard" of whether statements are true or false means "a high degree"[18] of "subjective awareness of probable falsity."[19] "Essentially, Ventura must prove Kyle was aware his statements in <u>American Sniper</u> were probably false."[20]

**II.     Liability – Counts II and III (Misappropriation/Unjust Enrichment)**

**A.     First Amendment/free-expression limitations on Counts II and III.**

In case after case after case, courts across the country have rejected misappropriation and unjust enrichment claims in the context of expressive works – sometimes based on narrow definitions of the claims, sometimes based on exceptions to the causes of action (such as exceptions for news, biographies, and other expressive works), sometimes because of the First Amendment, sometimes on multiple grounds. Ventura's claims here should also fail.

---

[17]     *Stepnes*, 663 F.3d at 963 (internal citations omitted).

[18]     *Masson*, 501 U.S. at 510 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)).

[19]     *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334 n.6 (1974) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

[20]     ECF #269 at 10.

US.53888124.14

Ventura offers nothing that would distinguish his case from any other defamation claim brought by a well-known public figure. If any such plaintiff could claim that allegedly false statements within a book or broadcast could support not only claims for defamation but also claims for misappropriation or unjust enrichment, the potential for wreaking havoc with free expression would be enormous. The focus could shift from any injury actual suffered by the plaintiff to the supposed benefits that the defendant sought or obtained.

Real people, famous and otherwise, are described in articles, books, broadcasts, and films hundreds of thousands of times every day. If the statements about them are false, they can sue for libel. They have no reason to assert, and very few even bother to assert, claims for misappropriation or unjust enrichment as Ventura has done here.[21]

---

[21]    Where both defamation and another claim arise out of the same facts, consistency, common law, and the First Amendment require that the defendant's liability be analyzed under the standards applicable to defamation. *See Hustler Magazine v. Falwell*, 485 U.S. 46, 57 (1988); *MSK EyES Ltd. v. Wells Fargo Bank*, 546 F.3d 533, 544 (8th Cir. 2008) ("Claims arising out of purported defamatory statements, such as tortious interference, are properly analyzed under the law of defamation."); *Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655*, 39 F.3d 191, 196 (8th Cir. 1994) ("a plaintiff may not avoid the protection afforded by the Constitution … merely by the use of creative pleading"); *Wild v. Rarig*, 302 Minn. 419, 447, 234 N.W.2d 775, 793 (1975); *Moore*, 821 N.W.2d at 597-99. *Accord, European Roasterie, Inc. v. Dale*, Civ. No. 10-53 (DWF/JJG), 2010 WL 1782239, at *5 (D. Minn. May 4, 2010) ("Tortious interference claims that are duplicative of a claim for defamation are properly dismissed."); *Guzhagin v. State Farm Mut. Auto. Ins. Co.*, 566 F. Supp. 2d 962, 969 (D. Minn. 2008) ("a Minnesota plaintiff is not permitted to avoid defenses to a defamation claim by challenging the defamatory statements under another doctrine"); *Pinto v. Internationale Set, Inc.*, 650 F. Supp. 306, 309 (D. Minn. 1986) ("[I]n Minnesota, a plaintiff cannot elude the absolute privilege by relabeling a claim that sounds in defamation."); *Mahoney & Hagberg v. Newgard*, 729 N.W.2d 302, 310 (Minn. 2007) ("Regardless of the label, appellant's claims are in essence defamation claims ..., and we find that absolute privilege operates to bar all of the claims at issue on this appeal.");

Notwithstanding the broad language of the RESTATEMENT (SECOND) OF TORTS § 652 C, comments and illustrations to that section restrict the common-law cause of action in order to protect free expression. A "plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities … ."[22] A plaintiff does not have "the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation."[23] Illustration 9 following RESTATEMENT (SECOND) OF TORTS § 652C, comment d, provides a particularly pertinent example of a non-actionable use of a name or likeness: "A writes and published an autobiography in which at several points, he names B as one of his friends. This is not an invasion of B's privacy."

Courts in other states that, like Minnesota, have embraced the misappropriation formulation of the RESTATEMENT (SECOND) OF TORTS § 652 C, have refused to apply it

---

*Zagaros v. Erickson*, 558 N.W.2d 516, 523 (Minn. App. 1997) (defamation standards and privileges apply to any "claim [that] is essentially relabeling a defamation claim"); *McGaa v. Glumack*, 441 N.W.2d 823, 827 (Minn. App. 1989) ("In Minnesota, one 'cannot elude the absolute privilege by relabeling a claim that sounds in defamation.'") (citations omitted). Other courts take the same approach. *E.g.*, *Mt. Hood Polaris, Inc. v. Martino (In re Gardner)*, 563 F.3d 981, 992 (9th Cir. 2009); *Ruffin-Steinback v. de Passe*, 82 F. Supp.2d 723, 731 (E.D. Mich. 2000) ("[W]here the plaintiff's theory of liability stems from the alleged falsity of the information disseminated, the action is properly considered as an action for defamation or false light invasion of privacy, not as an action for violation of the right of publicity."), *aff'd*, 267 F.3d 457,462-63 (6th Cir. 2001); *Apostle v. Booth Newspapers, Inc.*, 572 F. Supp. 897, 905 (W.D. Mich. 1983); *Dresbach v. Doubleday & Co., Inc.*, 518 F. Supp. 1285, 1288 (D.D.C. 1981); *Channel 4, KGBT v. Briggs*, 759 S.W.2d 939, 942 (Tex. 1988); *Hernandez v. Hayes*, 931 S.W.2d 648, 654 (Tex. App., San Antonio 1996).

[22]   RESTATEMENT (SECOND) OF TORTS § 652C, comment d.

[23]   *Id.*

US.53888124.14

to the use of the plaintiff's name or likeness in news reports, biographies, and other expressive works. For example:

- In *Battaglieri v. Mackinac Ctr. for Pub. Policy*, the Michigan Court of Appeals stated that a defendant can be "liable for the tort of misappropriation of likeness only if defendant's use of plaintiff's likeness was for a predominantly commercial purpose. … The use must be mainly for purposes of trade, without a redeeming public interest, news, or historical value."[24]

- *Seale v. Grammercy Pictures*[25] arose out of a movie about the Black Panther Party that used Bobby Seale's name and likeness. Seale alleged claims for infringement of his right of publicity and for false-light invasion of privacy. Seale objected to a scene in the film that showed him in a closed room engaging in the purchase of guns from an Asian gun dealer and another scene showing him and others confronting Eldridge Cleaver over the role that violence should play in the Black Panther Party's activities following the assassination of Dr. Martin Luther King, Jr. The false-light claim survived summary judgment, but the publicity claim did not. The federal district court discussed both "right of publicity" and "misappropriation of name and likeness," noting that "the use of a person's name and likeness in news, entertainment, and creative works does not infringe on the right of publicity" unless the "name or likeness is used solely to attract attention to a work that is not related to the identified person," and "the First Amendment provides greater protection to works of artistic expression such as movies, plays, books, and songs, than it provides to pure 'commercial' speech."[26] After a bench trial on the false light claim, the court entered judgment for defendants, because –

---

[24]    680 N.W.2d 915, 919-20 (Mich. App. 2004).

[25]    949 F. Supp. 331 (E.D. Pa. 1996).

[26]    *Id.* at 336-37.

US.53888124.14

although the film portrayed Seale in a false light – the defendants did not act with actual malice.[27]

- James Nichols – the brother of Terry Nichols, who along with Timothy McVeigh was arrested and convicted for the bombing of the Federal Building in Oklahoma City – objected to Michael Moore's well-known *Bowling for Columbine* documentary because it included statements that at a farm in Michigan: "McVeigh and the Nichols brothers made practice bombs before Oklahoma City. Terry and James were both arrested in connection to the bombing. Terry Nichols was convicted and received a life sentence. Timothy McVeigh was executed, but the feds didn't have the goods on James so the charges were dropped." James Nichols sued for defamation, false light invasion of privacy, and right of publicity.[28] The federal district court in Michigan granted judgment on the pleadings on the count for violation of the right to publicity, even though the defamation claim survived that first round of motions.[29] The district court later granted summary judgment to Moore because the statements about James Nichols were substantially true accounts of public records and reliable news reports and because plaintiff had not presented evidence of actual malice.[30]

- *Ruffin-Steinback v. de Passe*[31] involved a television mini-series about the Temptations. One of the plaintiffs was Earline Ruffin, the woman who raised David Ruffin although she was not his biological mother. She claimed

---

[27]   964 F. Supp. 918 (E.D. Pa. 1997), *aff'd*, 156 F.3d 1225 (3d Cir. 1998).

[28]   *Nichols v. Moore*, 334 F. Supp.2d 944 (E.D. Mich. 2004).

[29]   334 F. Supp.2d at 955-57 (E.D. Mich. 2004) (explaining, at 955 that: "Michigan courts have also recognized a fundamental difference between the use of a person's identity in connection with a legitimate news item and its commercial use in an advertisement for the pecuniary gain of the user").

[30]   396 F. Supp.2d 783 (E.D. Mich. 2005), *aff'd*, 477 F.3d 396 (6th Cir. 2007).

[31]   82 F. Supp.2d 723 (E.D. Mich. 2000).

US.53888124.14

defamation and false light based on a line in the TV mini-series spoken by the actor portraying David Ruffin: "My momma owed some pimp some money. Instead of paying him she gave me to him." There was a question whether the statement sufficiently identified Earline Ruffin so as to defame her, but her death after the complaint was filed foreclosed her claim.[32] Another plaintiff, former manager/agent Johnnie Mae Matthews, objected to a scene implying that she stole money and a car from the Temptations; her defamation and false-light claims survived summary judgment.[33] The Sixth Circuit affirmed summary judgment for defendants, concluding that "the use of plaintiffs' *fictionalized* likenesses in a work protected by the First Amendment and the advertising incidental to such uses did not give rise to a claim for relief under the plaintiffs' rights of publicity for the reasons stated by the district court."[34] The district court had rejected plaintiffs' contention "that the right of publicity should extend to defendants' actions in this case because, they allege, the depiction of the plaintiffs in this case was partially fictionalized and untrue. The scope of the right of publicity *does not depend, however, on the fictional or non-fictional character of the work*. ... Furthermore, to the extent that courts have been reluctant to extend the right of publicity to depictions of life-stories based on First Amendment considerations, those considerations are *no less relevant whether the work in question is fictional, non-fictional or a combination of the two*. ... where the plaintiff's theory of liability stems from the alleged falsity of the information disseminated, the action is properly considered as an action for defamation or false light invasion of privacy, not as an action for violation of the right of publicity."[35]

---

[32]   82 F. Supp.2d at 733.

[33]   *Id.* at 732-33.

[34]   267 F.3d at 462 (emphasis added).

[35]   82 F. Supp.2d at 730-31 (emphasis added).

US.53888124.14

In short, the RESTATEMENT does not preclude others from incorporating that person's name, features, or biography in a literary work, motion picture, news, or entertainment story,[36] or in advertisements or appearances to promote such works.[37]

---

[36]    *See also Matthews v. Wozencraft*, 15 F.3d 432, 437-40 (5th Cir. 1994); *Farah v. Esquire Magazine, Inc.*, 863 F. Supp.2d 29, 39 (D.D.C. 2012) ("[T]he First Amendment provides a privilege against a misappropriation invasion of privacy claim, permitting 'the use of a plaintiff's name or likeness when that use is made in the context of, and reasonably relates to, a publication concerning a matter that is newsworthy or of legitimate public concern.'") (rejecting claim by critic of President Obama that defendants misappropriated his name in an Internet posting that took a satirical swipe at "birthers"); *Hart v. Elec. Arts, Inc.*, 808 F. Supp. 2d 757, 102 & n.34 (D.N.J. 2011); *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 318 (D. D.C. 2011); *Whitehurst v. Showtime Networks, Inc.*, No. 1:08–CV–47, 2009 WL 3052663, at *6-*8 (E.D. Tex. Aug. 28, 2009); *Prince v. Viacom, Inc.*, Civ. No. H-07-4274, 2008 WL 1782288, at *3 (S.D. Tex. Apr. 18, 2008) ("People do not have a legally protectable interest in their pictures, names, or activities. We are all available as material for news stories, novels, histories, and the rest. Others can use what we do for profit. Newspapers only survive if they profit from the pictures and stories of people – uncompensated and non-consenting people."); *Whitehead v. Paramount Pictures Corp.*, 53 F. Supp. 2d 38, 53 (D.D.C. 1999) ("there is no tort for invasion of privacy for appropriating the story of another person's life").

[37]    *Ruffin-Steinback v. de Passe*, 267 F.3d 457, 462 (6th Cir. 2001) (holding that use of plaintiffs' likenesses "in a work protected by the First Amendment and the advertising incidental to such uses did not give rise to a claim for relief under the plaintiffs' rights of publicity") *Whitehurst*, 2009 WL 3052663 at *8 ("Because the film itself is protected and not subject to suit, it follows that the promotion of the film is protected."); *Thoroughbred Legends, LLC v. Walt Disney Co.*, Civ. No. 1:07-CV-1275-BBM, 2008 WL 616253, at *12 (N.D. Ga. Feb. 12, 2008) ("The use of Plaintiffs' likenesses in advertising the film is protected because the film itself is protected."); *Nichols*, 334 F. Supp. 2d at 957 (use of clip from movie featuring plaintiff for purposes of advertising the film did not violate plaintiff's right of publicity); *Lane v. Random House*, 985 F. Supp. 141, 146 (D.D.C. 1995) ("The newsworthiness privilege applies to advertisements for books, films, and other publications concerning matters of public interest."); *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1996) (First Amendment protected defendants' "creation, production, *and promotion* of a motion picture and history book which integrates fictitious people and events with the historical people and events surrounding the emergence of the Black Panther Party in the late 1960's") (emphasis added).

US.53888124.14

Regardless of the precise nature of the claim or variations among state laws, "there will be no recovery where the plaintiff's name or likeness is used in connection with communications about matters of legitimate public interest, so long as there is a real relationship between the plaintiff and the subject matter of the publication. A contrary rule might not survive constitutional scrutiny."[38] Like other communications in newspapers, magazines, books, movies, and radio and television broadcasts, AMERICAN SNIPER was about matters of legitimate public interest. In the circumstances of this case, Ventura's bid "for all property and benefits" from income from AMERICAN SNIPER,[39] violates both the common law and the First Amendment.

In *Simon & Schuster, Inc. v. Members of the NY State Crime Victims Bd.*, 502 U.S. 105 (1991), the Supreme Court invalidated, on First Amendment grounds, a "Son of Sam" statute, which New York's legislature had enacted based on a form of "unjust enrichment" reasoning:

> As the author of the statute explained: "It is abhorrent to one's sense of justice and decency that an individual ... can expect to receive large sums of money for his story once he is captured — while five people are dead, [and] other people were injured as a result of his conduct."

*Id.* at 108. The New York statute required that an accused or convicted criminal's income from works describing his crime be deposited in an escrow account and then made available for a five-year period to the victims of the crime and the criminal's other creditors. *Id.* If the time-limited, criminal author provisions of that statute transgressed

---

[38]     SACK ON DEFAMATION, at 12-84 – 12-85.

[39]     The claim is asserted explicitly under the unjust enrichment claim (Complaint, ¶51) and implicitly under the misappropriation claim.

16

the First Amendment – and they did – then a broader and more ambiguous application of "unjust enrichment" claims to authors and publishers also must wither under First Amendment scrutiny.

In *Simon & Schuster*, Justice Kennedy concurred in invalidating the statute, arguing that preventing criminals from profiting from their speech-related activities was not among the "few legal categories in which content-based regulation has been permitted or at least contemplated." 502 U.S. at 127 (Kennedy, J., concurring). The Court's *Simon & Schuster* opinion did not reject Justice Kennedy's discussion, but simply noted that "this case does [not] present a need to address Justice Kennedy's discussion of what is a longstanding debate … on an issue which the parties before us have neither briefed nor argued." 502 U.S. at 122 n.*. Two decades later, the Court did address, and accept, just such a categorical approach to the First Amendment. *Brown v. Entm't Merchs. Ass'n*, __ U.S. __, 131 S. Ct. 2729, 2733-34, 180 L.Ed.2d 708, 715 (2011); *United States v. Stevens*, 559 U.S. 460, 468-69 (2010).

Under the *Brown* and *Stevens* approach, the First Amendment prevents Ventura from extracting book profits from the Kyle Estate, even if Chris Kyle made false statements about Ventura that he believed to be false. Speech that "unjustly enriches" the speaker is not among the limited categories of speech that do not enjoy full First Amendment protection,[40] even if a court or jury concludes that the speaker is telling known lies in order to enhance his own public image or other interests.[41]

---

[40]      *Brown v. Entm't Merchs. Ass'n*, __ U.S. __, 131 S. Ct. at 2733-34, 180 L. Ed.2d at 715; *United States v. Stevens*, 559 U.S. at 468-69; *State v. Melchert-Dinkel*, No. A11-

This Court previously permitted Ventura's claims to proceed under a broad

construction of Minnesota law, reasoning that Chris Kyle's statements "are *not* protected

by the First Amendment if they were knowingly false and defamatory."[42] Such use of the

defamation standard in the context of a misappropriation or right-of-publicity claim is

unusual.[43] This Court's interpretation of Minnesota law[44] conflicts with the law

applicable to such claims in Texas, where Kyle resided, and in New York, where he

---

0987, 2014 WL 1047082, at *5 (Minn. March 19, 2014) ("following the guidance of the Supreme Court, we are wary of declaring any new categories of speech that fall outside of the First Amendment's umbrella protections").

[41]     *United States v. Alvarez*, ___ U.S. ___, 132 S.Ct. 2537, 183 L. Ed.2d 574 (2012).

[42]     ECF #125 at 6. Defendant's proposed Special Verdict Form incorporates the three elements from this statement (knowledge; falsity; and defamatory) as predicates for recovery under Counts II and III, as well as for any recovery under Count I.

[43]     *See*, *e.g.*, *Hustler*, 485 U.S. at 52 ("the 'actual malice' standard does not apply to the tort of appropriation of a right of publicity"); *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 461 (Cal. 1979) (Bird, C.J., concurring) (plaintiff's "effort to import the 'actual malice' standard of liability in defamation actions" to a claim for misappropriation "is misguided" because "[n]o such constitutional dichotomy exists in this area between truthful and fictional accounts"); *see also Rogers v. Grimaldi*, 875 F.2d 994, 1004-05 (2d Cir. 1989); *Winter v. DC Comics*, 69 P.3d 473, 478 (Cal. 2003) ("the right of publicity cannot, consistent with the First Amendment, be a right to control the celebrity's image by censoring disagreeable portrayals"); *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 21 P.3d 797, 802 n.7 (Cal. 2001) (explaining that "Chief Justice Bird's views in *Guglielmi* commanded the support of the majority of the court"); *see generally Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 149-66 (3d Cir. 2013) (analyzing "the different approaches courts have taken to resolving the tension between the First Amendment and the right of publicity").

[44]     In 1970, Judge Neville interpreted the right of privacy as applying to ""the *publication of biographical data of a well-known figure … for the purposes of* capitalizing upon the name by using it *in connection with a commercial project other than the dissemination of news or articles or biographies*." *Uhlaender v. Henrickson*, 316 F. Supp. 1277 (D. Minn. 1970) (emphasis added). That interpretation of Minnesota law would bar Ventura's claims in connection with the dissemination of Chris Kyle's biography.

US.53888124.14

physically made statements during broadcast interviews.[45] To the extent that the

application of specific state law is outcome-determinative, Texas law should apply.[46]

### B.    Elements of claim - misappropriation

Both Minnesota[47] (the state of Ventura's residence) and Texas[48] (the state of Chris

Kyle's residence and the place where he wrote the Book) have recognized the privacy tort

of misappropriation as articulated in the RESTATEMENT (SECOND) OF TORTS, § 652C.[49]

That section provides: "One who appropriates to his own use or benefit the name or

likeness of another is subject to liability to the other for invasion of his privacy." The

goal of this rule is to allow an individual "the exclusive use of his own identity."[50]

Although the protection of an individual's personal feelings against mental distress "is an

---

[45]    *See* ECF #25 at 14-15, n. 6; *see also Bogie v. Rosenberg*, 705 F.3d 603, 614-16 (7th Cir. 2013) (misappropriation claim dismissed as matter of law because of newsworthiness/public-interest and incidental-use exceptions; plaintiff appeared for 16 seconds in Joan Rivers documentary – 0.3 percent of the entire film) (applying Wisconsin law, interpreted in light of equivalent New York precedents), *attorney fees awarded to defendant*, 2013 WL 5423055, *6-*7 (W.D. Wis. Sept. 26, 2013) (plaintiff's claim was frivolous because she had "no basis in reality" for alleging that her appearance "substantially contributed to defendants' commercial gain").

[46]    *See* pp.22-25 below.

[47]    *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233-35 (Minn. 1998); *see also* 4A Minn. Prac., Jury Instr. Guides—Civil CIVJIG § 72.15 (2006 5th ed.) (listing RESTATEMENT  § 652 C comments as authorities recognized under Minnesota law).

[48]    *Express One Int'l v. Steinbeck*, 53 S.W.3d 895 (Tex. App. 2001); *see also Matthews v. Wozencraft*, 15 F.3d 432, 437 (5th Cir. 1994).

[49]    New York (the state where Chris Kyle made Published Statements identifying Ventura by name) does not recognize any of the common law privacy torts. *Messenger v. Gruner + Jahr Printing & Publ'g*, 94 N.Y.2d 436, 441, 727 N.E.2d 549, 551 (N.Y. 2000). Instead, New York provides a limited statutory right of privacy under Civil Rights Law §§50 and 51. *Id.* The Complaint does not assert any cause of action under that statute, or any other statute.

[50]    RESTATEMENT (SECOND) OF TORTS § 652C, comment a.

important factor leading to a recognition of the rule, the right created by it is in the nature of a property right, … which will entitle the licensee to maintain an action to protect it."[51]

Appropriation claims commonly arise from "use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose."[52] Although this rule is "not limited to commercial appropriation,"[53] a "plaintiff's name is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities … ."[54] A plaintiff does not have "the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation."[55] Illustration 9 following RESTATEMENT (SECOND) OF TORTS § 652C, comment d, provides a particularly pertinent example of a non-actionable use of a name or likeness: "A writes and published an autobiography in which at several points, he names B as one of his friends. This is not an invasion of B's privacy." As § 652C, comment d further explains, the value of one's name or likeness is not appropriated "when it is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity" and the "fact that the defendant is engaged in the business of publication, for example of a newspaper, out of

---

[51]     *Id.*

[52]     RESTATEMENT (SECOND) OF TORTS § 652C, comment b.

[53]     *Id.*

[54]     RESTATEMENT (SECOND) OF TORTS § 652C, comment d.

[55]     *Id.*

US.53888124.14

which he makes or seeks to make a profit, is not enough to make the incidental

publication a commercial use of the name or likeness."

   In 'join[ing] the majority of jurisdictions and recogniz[ing] the tort of invasion of

privacy"[56] – including misappropriation – in 1998, the Minnesota Supreme not only

expressly adopted the RESTATEMENT (SECOND) OF TORTS § 652C, but also implicitly

accepted that section's explanatory comments. [57] Courts in other jurisdictions have

construed those comments to preclude claims based upon the incidental use of names and

likenesses in newspapers, books, and other expressive works,[58] observing a crucial

distinction between situations in which the defendant makes an incidental use of the

plaintiff's name, portrait or picture and those in which the defendant uses the plaintiff's

name, portrait or picture deliberately to exploit its value for advertising or trade

purposes.[59]

---

[56]     *Lake*, 582 N.W.2d at 235.

[57]     *See* 4A Minn. Prac., Jury Instr. Guides—Civil CIVJIG § 72.15 (2006 5th ed.)
(listing RESTATEMENT  § 652 C comments as authorities recognized under Minnesota
law).

[58]     *Albright v. Morton*, 321 F. Supp.2d 130, 139-40 (D. Mass. 2004), *aff'd*, 410 F.3d
69, 2005 U.S. App. LEXIS 10182, at *10 (1st Cir. 2005); *Cox v. Hatch*, 761 P.2d 556,
565-66 (Utah 1988).

[59]     *Benally v. Hundred Arrows Press*, 614 F. Supp. 969, 979-80 (D. N.M. 1985),
*reversed and remanded on other grounds and as to other claims and other defendants*,
*sub nom. Benally v. Amon Carter Museum of Western Art*, 858 F.2d 681 (10th Cir. 1988);
*Tropeano v. Atlantic Monthly Co.*, 400 N.E.2d 847, 850 (Mass. 1980).

US.53888124.14

This Court permitted Ventura's claim to proceed under a broad construction of Minnesota law.[60] Texas courts have not permitted such broad application of the RESTATEMENT.[61]

To the extent that the application of Texas or Minnesota law would be outcome-determinative, the Court should apply Texas law. Under Minnesota choice-of-law standards, [62] Minnesota substantive law could not be constitutionally applied to a

---

[60]     ECF #125. The Court reasoned that Chris Kyle's statements "are *not* protected by the First Amendment if they were knowingly false and defamatory." ECF #125 at 6. Such use of the defamation standard in the context of a misappropriation or right-of-publicity claim is unusual. *See* n.43 above. This Court's interpretation of Minnesota law conflicts with the law applicable to such claims in Texas, where Kyle resided, and in New York, where he physically made statements during broadcast interviews. *See* ECF #25 at 14-15, n. 6; *see also Bogie v. Rosenberg*, 705 F.3d 603, 614-16 (7th Cir. 2013) (misappropriation claim dismissed as matter of law because of newsworthiness/public-interest and incidental-use exceptions; plaintiff appeared for 16 seconds in Joan Rivers documentary – 0.3 percent of the entire film) (applying Wisconsin law, interpreted in light of equivalent New York precedents), *attorney fees awarded to defendant*, 2013 WL 5423055, *6-7 (W.D. Wis. Sept. 26, 2013) (plaintiff's claim was frivolous because she had "no basis in reality" for alleging that her appearance "substantially contributed to defendants' commercial gain").

[61]     *Matthews*, 15 F.3d at 437 ("The protection of 'name or likeness' under Texas law … does not include a person's life story. If Texas law did protect such a right, it was not 'appropriated' [by having undercover narcotics officer's life events included in a novel and motion picture]."); *id.* at 439 ("Even if Texas courts recognized a cause of action for misappropriation of events in one's life, it likely would recognize an exception for biographies."); *Prince* 2008 WL 1782288, at *3 ("People do not have a legally protectable interest in their pictures, names, or activities. We are all available as material for news stories, novels, histories, and the rest. Others can use what we do for profit.").

[62]     In diversity of citizenship cases, federal courts "look to the choice-of-law rules of the forum State to determine which law applies." *See, e.g.*, *H&R Block Tax Servs. LLC v. Franklin*, 691 F.3d 941, 943 (8th Cir. 2012) (citation omitted). Minnesota substantive law does not apply to the claims automatically; rather, the federal court must examine Minnesota's choice-of-law rules to determine whether another state's law is more appropriate. *Travelers Prop. Cas. Co. of Am. v. St.-Gobain Tech. Fabrics Canada Ltd.*, 474 F. Supp. 2d 1075, 1083 (D. Minn. 2007).

US.53888124.14

defendant who lacked any connection to the *state* of Minnesota,[63] thus ending the choice-

of-law analysis in favor of applying Texas law. Although national distribution of the

---

Under Minnesota's choice-of-law rules, the reviewing court must first consider "whether the choice of one state's law over another's creates an actual conflict." *Jepson v. Gen. Cas. Co.*, 513 N.W.2d 467, 469 (Minn. 1994). "A conflict exists if the choice of one forum's law over the other will determine the outcome of the case." *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000). Then, the court must ask 'whether the law of both states' can be constitutionally applied." *Id.*; *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 815-23 (1985) (finding a Due Process violation when the court applies Kansas substantive law without considering differences in other states).

If there is an outcome determinative conflict, and if more than one of the state laws at issue may constitutionally be applied, Minnesota courts will next examine the five choice-influencing factors: (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *See, Jepson*, 513 N.W.2d at 470 (citing *Milkovich v. Saari*, 203 N.W.2d 408, 412 (Minn. 1973)). This test applies in both tort and contract cases. *Id.*

[63]   "[F]or a State's substantive law to be selected in a constitutionally permissive manner, that State must have a significant contact or significant aggregation of contacts [with the occurrence giving rise to the litigation], creating state interests such that choice of its law is neither arbitrary nor fundamentally unfair." *See, Jepson*, 513 N.W.2d at 469-70, *quoting Allstate Ins. v. Hague*, 449 U.S. 302,312-13 (1981).

Although Defendant did not and does not challenge this Court's personal jurisdiction over Kyle, the Supreme Court recently emphasized the importance – for purposes of determining whether a defendant's due process rights would be violated by the forum – of considering where the defendant's alleged conduct took place that made the tort complete. *Cf. Walden v. Fiore*, 134 S. Ct. 1115 (Feb. 25, 2014) ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way."), *id.* (finding lack of personal jurisdiction over defendant because none of the alleged tortious actions of the defendant occurred in plaintiff's state of residence). A forum may have sufficient minimum contacts to assert jurisdiction over a defendant and yet still lack a constitutional basis for applying its own law. *Cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) (noting a choice-of-law analysis is distinct from the baseline minimum-contacts jurisdictional analysis). *Walden* is significant for purposes of the present case because, if the forum lacks even the minimum contacts for personal jurisdiction, it *a fortiori* must lack sufficient constitutional basis for applying its own law.

US.53888124.14

Published Statements and Ventura's residence in Minnesota may provide sufficient

contacts with the State of Minnesota for Ventura's defamation claim, the pertinent

conduct that made Ventura's misappropriation (and unjust enrichment) claims complete

did not occur in Minnesota. Rather, Chris Kyle wrote AMERICAN SNIPER in Texas and

received royalty payments in Texas, his state of residence.

Even if both Minnesota and Texas substantive law could constitutionally be

applied to the misappropriation and unjust enrichment claims, under the only pertinent

two factors of the five-factor test,[64] Texas is the state where nearly all of the significant

litigation-producing contacts occurred, and Texas – rather than Minnesota – has the

stronger governmental interest in Kyle's conduct – both in preventing "unjust

enrichment" to him and in protecting his free speech rights. Both Ventura's

misappropriation claim and his unjust enrichment claim appear to seek all of Chris Kyle's

income from the sale of AMERICAN SNIPER books and/or any subsidiary or ancillary

rights sales.[65] Unlike injury to reputation,[66] that aspect of damages is complete upon

Kyle's receipt of "unjust enrichment" (which would occur in Kyle's home state of

---

[64] The factors that consider the "maintenance of interstate order" and the "advancement of the forum's governmental interest" are the most pertinent in this case. Courts have found that the factors considering "predictability of result" and "simplification of judicial task" are not important or not valuable in torts cases. *See, e.g.*, *Jepson*, 513 N.W.2d at 473; *Myers v. Gov't Emps. Ins. Co.*, 225 N.W.2d 238 (Minn. 1974). Minnesota courts have not placed an emphasis on "the better rule of law" factor in more than twenty years. *See Nodak Mut. Ins. Co.*, 604 N.W.2d at 96.

[65] *See* n.39 above.

[66] *Cf. Walden*, 134 S. Ct. at 1123-24.

US.53888124.14

Texas), rather than upon the effect of Kyle's actions on Ventura (in Minnesota and/or Mexico and/or elsewhere).[67]

### C.   Elements of claim – unjust enrichment

Under Minnesota law, a defendant has been unjustly enriched if he "has knowingly received or obtained something of value for which [he] 'in equity and good conscience' should pay."[68] Unjust enrichment claims "do not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term 'unjustly' could mean illegally or unlawfully."[69]

Under Texas law, unjust enrichment is not an independent cause of action; rather, an action for restitution, based on unjust enrichment, will lie to recover money received on a consideration that has failed in whole or in part.[70] Because this case does not involve any failure of consideration, Ventura has no claim under Texas law. Texas law should apply. *See* pp.22-25 above.

At common law, Ventura's defamation claim – win or lose – provides an adequate remedy at law, foreclosing any "equitable" claim on Chris Kyle's proceeds from

---

[67]    *See also* ECF #125 at 7-8 (unjust enrichment claims relate to the defendant's benefits rather than the plaintiff's damage).

[68]    *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 306 (Minn. 1996) (citations omitted).

[69]    *Id.*; *see also McFarland v. E&K Corp.*, 18 U.S.P.Q.2d 1246, 1991 U.S. Dist. LEXIS 1496, *8 (D. Minn. 1991); *First Nat'l Bank v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981).

[70]    *See, e.g.*, *Walker v. Cotter Props.*, 181 S.W.3d 895, 905 (Tex. App. 2006); *Oxford Fin. Co., Inc. v. Velez*, 807 S.W.2d 460, 465 (Tex. App. 1991).

AMERICAN SNIPER. American courts have long followed the rule that courts of equity
have no jurisdiction to enjoin a libel, because the party wronged has an adequate remedy
at law in the form of an action for damages.[71] Unjust enrichment is an equitable remedy
and a "party may not have equitable relief where there is an adequate remedy at law
available."[72]

###### D.    Disputed element – benefits obtained

This Court allowed Ventura to proceed under a broad construction of Minnesota
law that adopts a damages theory focused on the benefit received by the defendant, rather
than any injury sustained by the plaintiff related to a privacy or property right.[73] The

---

[71]    *Francis v. Flinn*, 118 U.S. 385, 389 (1886) ("If the publications in the newspapers
are false and injurious, [plaintiff] can prosecute the publishers for libel. If a court of
equity could interfere and use its remedy of injunction in such cases, it would draw to
itself the greater part of the litigation properly belonging to courts of law."); *Metro.
Opera Ass'n v. Local 100, Hotel Empls and Rest. Empls Int'l Union*, 239 F.3d 172, 177
(2d Cir. 2001); *Am. Malting Co. v. Keitel*, 209 F. 351, 356 (2d Cir. 1913); *Kramer v.
Thompson*, 947 F.2d 666, 677, 679 (3d Cir. 1991) ("the maxim that equity will not enjoin
a libel has enjoyed nearly two centuries of widespread acceptance at common law";
"even a jury determination that particular statements are libelous does not address the
traditional notion that equity should not intervene where legal remedies (i.e., damages)
are adequate, either in practice or even just in theory"); *D'Ambrosio v. D'Ambrosio*, 610
S.E.2d 876, 885-86 (Va. App. 2005) (equitable remedy of injunction is inappropriate
because plaintiff had an adequate remedy at law in the form of a common law action for
defamation).

The Minnesota Supreme Court affirmed one injunction against commercial speech
found to be false and misleading after a full jury trial, but did so under the Deceptive
Trade Practices Act, not as a matter of equity. *Advanced Training Sys. v. Caswell Equip.
Co.*, 352 N.W.2d 1, 11 (Minn. 1984). *Caswell* therefore does not apply here.

[72]    *ServiceMaster of St. Cloud*, 544 N.W.2d at 305.

[73]    ECF #125 at 7-8. The Court reasoned that the unjust enrichment claim "depends
on the truth or falsity of Kyle's statements." *Id.* at 8. In addition, the Court found that the
unjust enrichment claim is not duplicative of the defamation claim because "recovery

evidence will show that Chris Kyle did not derive any meaningful benefit from the

minimal description of the "Scruff Face" encounter in the Book or the mentions of

Ventura's name in media interviews.

### E.      Disputed element – illegal or unlawful manner of obtaining benefits

Ventura's claim also must fail because the description of "Scruff Face" in

AMERICAN SNIPER and the mentions of Ventura in media interviews related to the Book

were neither illegal nor unlawful. Judge Harry MacLaughlin rejected a similar claim in

1990, explaining:

> A claim of unjust enrichment requires proof that the defendants received a
> benefit from the efforts of others and proof that the defendants' enrichment
> was unjust, "in the sense that 'unjust[]' could mean illegal[] or unlawful[]."
> *First National Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn.
> 1981); *Iverson v. Fjoslien*, 298 Minn. 168, 213 N.W.2d 627, 629 (1973). In
> cases involving allegations of wrongful publication, a publisher is not held
> to have received a benefit merely because it referred to plaintiff in a
> magazine that was published for profit. In such cases, unjust enrichment
> requires proof of a deliberate association with the defendant's products in
> an advertising or promotional scheme. *Young v. That Was the Week That
> Was*, 312 F. Supp. 1337, 1341-43 (N.D. Ohio 1969), *aff'd*, 423 F.2d 265
> (6th Cir. 1970). Plaintiff was not associated with a scheme to advertise or
> promote defendants' products. Consequently plaintiff cannot establish that
> defendants received a "benefit" by their use of information about her.

*Ruzicka v. Conde Nast Publ'ns, Inc.*, 733 F. Supp. 1289, 1301-02 (D. Minn. 1990). The

Eighth Circuit affirmed the summary judgment against plaintiff on that claim. *Ruzicka*,

939 F.2d 578, 583 n.8 (8th Cir. 1991) ("Ruzicka presses a claim for unjust enrichment on

the theory that through publication of the Glamour article in violation of her rights, a

---

under the two claims is distinct-defamation relates to Ventura's damage while unjust
enrichment relates to Kyle's benefit." *Id.*

constructive trust in her favor was created. We agree with the district court that Ruzicka

has not established the elements of unjust enrichment under Minnesota law.").

Kyle did not use Ventura's name in a scheme to advertise or promote products. He

simply responded to questions from interviewers.[74]

## III.   Damages

### A.   Speculation not permitted

Damages that are "remote and speculative" cannot be recovered, particularly when

the alleged loss is conjectural both in existence of a causal relationship and in amount of

the loss. *Jackson v. Reiling*, 249 N.W.2d 896, 897 (Minn. 1977); *Faimon v. Winona State*

*Univ.*, 540 N.W.2d 879, 884 (Minn. App. 1995).

### B.   Defamation

#### 1.   Presumed damages

Plaintiff's primary basis for seeking an award of compensatory damages likely

will take the form of "presumed damages." Such damages may be awarded against

Defendant only if Plaintiff proves, by clear and convincing evidence, that Defendant

published false and defamatory statements about him with "actual malice."[75] Presumed

damages are one component of what common law called "general damages."

"General damages are a form of compensatory damages.  ...  In defamation actions

general damages are imposed for the purpose of compensating the plaintiff for the harm

that the publication has caused to his reputation.  ...  At common law general damages

---

[74]     *See* n.37 above.

[75]     *Gertz*, 418 U.S. at 334, 349-50.

US.53888124.14

have traditionally been awarded not only for harm to reputation that is proved to have

occurred, but also, in the absence of this proof, for harm to reputation that would

normally be assumed to flow from a defamatory publication of the nature involved."

RESTATEMENT (SECOND) OF TORTS, § 621, comment a (1977).

"Although general damages were presumed [at common law in defamation

actions], there were nonetheless meant to be an approximate compensation for real injury,

'some estimate, however rough, of the probable degree of *actual* loss a man will suffer

given the particular charge against him'" and any award of general damages in a

defamation action should compensate plaintiffs only "'for the injuries which have

resulted directly from and [are] a natural consequence of **the statements referred to** in'

the offending communication." R. Sack, SACK ON DEFAMATION: LIBEL, SLANDER, AND

RELATED PROBLEMS §10:3.3 at 10-10 – 10-11 (4th ed. 2010 & 2013 Supp.) (bolded

emphasis added, alteration in original; citations omitted); *see also* W.P. Keeton, PROSSER

AND KEETON ON THE LAW OF TORTS § 116A at 843 (5th ed. 1984) ("general damages at

common law were an estimate, however rough, of the *probable extent of actual loss* a

person had suffered and would suffer in the future, even though the loss could not be

identified in terms of advantageous relationships lost, either from a monetary or

enjoyment-of-life standpoint") (emphasis added). The court should not permit presumed

damages to become a vehicle for wild speculation, or for awarding punitive damages in

disguise. "[I]n the absence of proof, general damages are limited to harm that 'would

normally be assumed to flow from a defamatory publication of the nature involved.'"

*Longbehn v. Schoenrock*, 727 N.W.2d 153, 162-63 (Minn. App. 2007) (remanding for

US.53888124.14

new trial on general damages, because jury verdict "far exceeds the amount of past and future harm … that would normally flow from a publication of this kind"). In the present case, therefore, although Plaintiff will not have to provide the jury with evidence of actual injury to his reputation in order to recover presumed damages, the jury's assessment of presumed damages must be based upon consideration of real, not speculative, injury.

The presumption of injury can be rebutted or enhanced by direct evidence. "What may be presumed may be proved." *Thorson v. Albert Lea Publ'g Co.*, 190 Minn. 200, 205, 251 N.W. 177, 179 (1933). And what "may be proved" may equally be disproved. "[A]ny evidence is relevant which logically tends to *prove or disprove* a material fact in issue." *Boland v. Morrill*, 270 Minn. 86, 98-99, 132 N.W.2d 711, 719 (1965) (emphasis added); *see also* Fed. R. Evid. 401 ("Evidence is relevant if (a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Relevant evidence is generally admissible. *See* Fed. R. Evid. 402. Defendant therefore intends to introduce evidence of *lack* of injury to Plaintiff's reputation from the Published Statements at issue, and to argue that Plaintiff has not been harmed at all.[76] Such evidence will include the testimony of expert witness Prof. David A. Schultz.

---

[76]     *Longbehn v. Schoenrock*, No. A09-2141, 2010 WL 3000283, at *5-*6 (Minn. App. Aug. 3, 2010) (unpublished) (the bad character of a plaintiff in a libel action may be shown in mitigation of damages by presenting evidence of the plaintiff's general reputation, and such evidence is not inadmissible hearsay), *citing* Minn. R. Evid. 803(21), and *Lydiard v. Daily News Co.*, 110 Minn. 140, 145, 124 N.W. 985, 987 (1910).

To the extent that Plaintiff seeks to bolster any presumption of injury through testimony or other evidence as to the alleged effect of the broadcasts on his reputation,[77] such evidence of harm to reputation must be admissible and probative. Hearsay testimony is generally inadmissible.[78] Testimony from any witness regarding the effect the Published Statements had or may have had upon other persons would be classic hearsay. Even if Plaintiff could invoke some exception to the hearsay rule, evidence of general inquiries from other people, or of supportive or sympathetic comments from friends and family members about the statements, or Plaintiff's inchoate feelings of being snubbed, is not proof of any actual injury to Plaintiff's reputation under Minnesota law.[79]

Defendant's separate Motion in Limine therefore requests the Court to exclude hearsay evidence of damages.

### 2.    Financial damages

Ventura claims that the Published Statements adversely affected his businesses and professions.[80] He concedes, however, that his income can fluctuate greatly from year to year,[81] and he has no direct evidence that the Published Statements contributed to his

---

[77]    Evidence of actual harm would require plaintiffs to present evidence of his reputation both before and after the allegedly false and defamatory statements. *Nygard v. Walsh*, 2014 WL 349761 at *4-*5 (Minn. App. Feb. 3, 2014). Witnesses' testimony that they did not change their opinion of a plaintiff in any way following the defendant's statements would show lack of harm to reputation. *Id.*

[78]    Fed. R. Evid. 802.

[79]    *Richie v. Paramount Pictures*, 544 N.W.2d 21, 26-27 (Minn. 1996).

[80]    Complaint, ¶43; Ventura Tr. (ECF #114-15) at 251:1-16.

[81]    Ventura Tr. (ECF #114-15) at 179:18-23.

US.53888124.14

2012 income being less than his income in some prior years.[82] Correlation does not equal

causation. Any general damage to Ventura's business reputation is insufficient as a

matter of law to establish that an expectation of future economic advantage was

damaged.[83]

### 3.     Injury to reputation

Plaintiff's recovery of compensatory damages for injury to his reputation must be

based upon the specific allegedly defamatory Published Statements at issue, and not from

the Book or broadcasts as a whole or from altogether separate causes. *See Gertz*, 418 U.S.

at 349-350; *Richie*, 544 N.W.2d at 26; *Carradine v. State*, 511 N.W.2d 733, 737 (1994);

*Steele v. Tell*, 1994 WL 593924 at *3 (Minn. App. 1994) (unpublished); *cf. Littlefield v.*

*Fort Dodge Messenger*, 614 F.2d 581, 584 (8th Cir. 1980) (under *Gertz*, plaintiff failed to

prove damage due to allegedly defamatory article, where supervisor may have terminated

him due to knowledge that he had been disbarred rather than belief that he was felon).

### 4.     Embarrassment and humiliation

Over the course of discovery in this lawsuit, Plaintiff abandoned his early claims

for damages based upon emotional distress. He began this litigation alleging that he "has

been embarrassed and humiliated, and he has suffered emotional distress."[84] Rather than

produce his medical records relating to psychological/psychiatric history, however,

Plaintiff stipulated to "remove any reference to 'mental distress' and 'emotional distress'

---

[82]     Ventura Tr. (ECF #114-15) at252:19-22.

[83]     *Gieseke v. IDCA, Inc.*, No. A12-0713, ___ N.W.2d ___, 2014 WL 1230224, at *10
(Minn. Mar. 26, 2014).

[84]     Complaint, ¶42.

or variations of those terms (including such references in Paragraph 42 of the Complaint.

This stipulation does not affect Plaintiff's continuing allegations regarding humiliation,

embarrassment, harm to his reputation and standing in the community, or regarding

negative effects in connection with Plaintiff's business and professions."[85]

The absence of medical support for the abandoned claims for mental/emotional

distress is significant. Minnesota law does not permit recovery of such damages in the

absence of reliable evidence. Minnesota law requires that plaintiffs offer medical proof of

physical manifestations of alleged mental distress or anguish.[86]

Plaintiff likely will have a difficult time distinguishing damages for "mental

distress" and "emotional distress," which he has withdrawn, from damages for

"humiliation, embarrassment" which he continues to assert.

In *Richie v. Paramount Pictures*, the Minnesota Supreme Court addressed a single

type of defamation damage through serial references to "mental anguish and

humiliation," "damages for wounded feelings and humiliation," "emotional damages,"

"personal humiliation and mental anguish and suffering," "emotional harm," "mental

anguish," "emotional damage," "emotional distress," "mental distress," and "emotional

damages."[87] The Court's discussion does not suggest that it saw any distinction among

these terms, and therefore equates "mental anguish/distress" and "emotional distress"

---

[85]     ECF #16.

[86]     *E.g.*, *Deli v. Univ. of Minn.*, 578 N.W.2d 779, 783-84 (Minn. App. 1998);
*Copeland v. Hubbard Broad., Inc.*, 1997 WL 729195 at *4-*5 (Minn. App. 1997)
(unpublished); *Soucek v. Banham*, 503 N.W.2d 153, 164 (Minn. App. 1993).

[87]     544 N.W.2d at 24-28.

with "personal humiliation." There is little if any meaningful way to distinguish between "emotional distress" and "mental anguish" in the context of general damages for defamation.

For these reasons and as discussed in greater detail in Defendant's separate Motion in Limine, this Court should prohibit any evidence or argument by Plaintiff or his counsel on the subject of "emotional distress" or "mental anguish" and should instruct the jury that its consideration of presumed damages should not include the factors of emotional distress or mental anguish. In addition, Plaintiff has no claim for damages based upon the grief allegedly suffered by any of his family members.[88]

### C.    Misappropriation/Unjust enrichment

The Complaint (¶¶46-48) does not specify the type or measure of damages Ventura seeks to recover for misappropriation.

No Minnesota court has squarely addressed the issue of damages related to a claim for misappropriation. Rather, the Eight Circuit upheld a damages award in *Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 730 (8th Cir. 1995) for Titan Sports' exploitation of Ventura's performances under Ventura's right to publicity. Misappropriation plaintiffs are generally entitled to compensatory damages related to mental and physical distress. *See* RESTATEMENT (SECOND) OF TORTS § 652H; *Ventura*, 65 F.3d at 730 (noting the policy underlying the tort of invasion of privacy is the protection of privacy and solicitude from mental distress). Ventura has withdrawn claims based on those

---

[88]     *Thorson v. Albert Lea Publishing Co.*, 190 Minn. 200, 207, 251 N.W. 177, 180 (1933) (plaintiff's testimony as to the effect libelous article had upon his family members was inadmissible; members of defamed person's family have no claim for damages).

elements.[89] Plaintiff may only recover damages that are the direct and natural result of the Published Statements.

Minnesota law allows plaintiffs to pursue compensatory damages for unjust enrichment. Such damages must be the direct and natural result of the Published Statements. This Court has stated that recovery of damages for unjust enrichment relates to any benefit received by the defendant, rather than mental anguish suffered by the plaintiff.[90]

Under Texas law, a plaintiff may recover general damages plus any special damages which are proven for invasion of privacy through misappropriation. *See*, *Nat'l Bank of Commerce v. Shaklee Corp.*, 503 F. Supp. 533 (W.D. Tex. 1980) (citing *Manville v. Borg-Warner Corp.*, 418 F.2d 434 (8th Cir. 1969). General damages are those which naturally, proximately, and necessarily result from the improper communications. *See Moore v. Big Picture Co.*, 828 F.2d 270, 277 (5th Cir. 1987). In assessing damages awards, Texas courts look to the RESTATEMENT (SECOND) OF TORTS § 652H, which provides that:

> One who has established a cause of action for invasion of his privacy is entitled to recover damages for (a) the harm to his interest in privacy resulting from the invasion; (b) his mental distress proved to have been suffered if it is of a kind that normally results from such an invasion; and (c) special damage of which the invasion is a legal cause.

*Shaklee*, 503 F.Supp. at 547. Special damages that are recoverable in Texas include claims where the value of a plaintiff's endorsement is sold on the open market instead of

---

[89]     *See* pp.32-34 above.

[90]     ECF #125 at 8 (citing *Zirinsky v. Sheehan*, 413 F.2d 481, 489 (8th Cir. 1969)).

US.53888124.14

just being misappropriated by the defendant. *Id.* The measure of special damages is based on an unjust enrichment theory. *Id.*

Unlike some misappropriation plaintiffs who might seek damages for the impact on the endorsement value of their name,[91] Ventura cannot make any plausible claim that Chris Kyle's brief mentions of Ventura conveyed any sense that Ventura was endorsing Kyle's book and he has presented no evidence that those mentions had any impact on his endorsements of other material. Ventura has disclaimed any such "right of publicity" aspect of Count II, arguing that "a 'right-of-publicity' claim … is not even recognized in Minnesota."[92]

Under the unjust enrichment claim (Complaint, ¶51), Ventura seeks "restitution … for all property and benefits unjustly received, including but not limited to income from

---

[91]    *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, No. 12-1992, 2014 U.S. App. LEXIS 3030 at *8-*9, *33 (7th Cir. Feb. 19, 2014); *Matthews*, 15 F.3d at 437-38.

[92]    ECF #39 (Ventura opposition to motion for partial summary judgment) at 28 & n.106. Courts elsewhere have noted the similarities between the torts of misappropriation and right-of-publicity. *E.g.*, *Gionfriddo v. Major League Baseball*, 114 Cal. Rptr.2d 307, 313 (Cal. App., 1st Dist. 2001) ("The common law right of publicity derives from the fourth category of invasion of privacy identified by Dean Prosser, described as 'appropriation' of a plaintiff's name or likeness for the defendant's advantage."); *Doe v. TCI Cablevision*, 110 S.W.3d 363, 368-69 (Mo. 2003) ("Despite the differences in the types of damages that may be recovered, the elements of the two torts are essentially the same. … Given the similarity of elements of the two actions, Missouri cases analyzing the tort of misappropriation of name are pertinent to our recognition of a right of publicity claim."); *see generally*, SACK ON DEFAMATION §12.5.1. In misappropriation cases, "damages are 'measured by "mental distress" – some bruising of the human psyche,'" while in right-of-publicity cases, the measure of damages is the amount of the fair market value that defendant should have paid to use plaintiff's name and damage done to the endorsement value of plaintiff's name. *Doe*, 110 S.W.3d at 368. The Complaint, ¶46, speaks of Ventura's "property right in the exclusive commercial use of his own identity." He has withdrawn any claim for "damages based upon mental distress and emotional distress." [ECF #16; *see* pp.32-34 above.]

US.53888124.14

the sale of *American Sniper* books and/or any subsidiary or ancillary rights sales." At least under Texas law,[93] these damages claims are duplicative of certain types of damages for misappropriation. No reason exists to submit both claims to the jury for the same recovery.

### D.   No recovery of attorneys fees

Ventura seeks an award of "attorneys' fees incurred herein."[94] Such awards are not permitted under any of Ventura's claims. "Generally, attorneys fees may not be awarded to a successful litigant absent specific contractual or statutory authority." *Cherne Indus., Inc. v. Grounds & Assoc., Inc.*, 278 N.W.2d 81, 96 (Minn. 1979). No such exceptions apply here.

## IV.   Evidentiary Issues

### A.   Motions in limine

Defendant is submitting several motions in limine to prevent plaintiff from introducing "evidence" which does not belong in court.  Those motions are supported by separate memoranda of law, submitted concurrently with this Trial Brief.

### B.   Other evidentiary issues

Plaintiff's past submissions in this Court (including affidavits) have included material that – if proffered at trial – will draw objections on such grounds as lack of

---

[93]     Because unjust enrichment is not a separate cause of action in Texas, Ventura could not recover a separate damages award for unjust enrichment beyond any damages he would receive for misappropriation. *See*, *Shaklee*, 503 F.Supp. at 547 (award of special damages for claims of misappropriation are based on the theory of unjust enrichment).

[94]     Complaint, p.17.

relevance, lack of foundation, hearsay, improper speculation, improper character

evidence, and improper lay opinion.


Dated:  April 21, 2014                    **FAEGRE BAKER DANIELS LLP**


                                          By:  /s/ John P. Borger
                                               John P. Borger, #9878
                                               Leita Walker, #387095
                                               2200 Wells Fargo Center
                                               90 South Seventh Street
                                               Minneapolis, MN 55402
                                               Telephone:  (612) 766-7000
                                               Fax:  (612) 766-1600
                                               john.borger@FaegreBD.com
                                               leita.walker@FaegreBD.com

                                               Attorneys for Defendant Taya Kyle,
                                               Executor of the Estate of Chris Kyle
                                               (deceased)

US.53888124.14